83,899-01

# Martinez & Martinez
### Attorneys at Law
## Chase Bank Of Texas - Gulfgate
### 2900 Woodridge, Suite 202
### Houston, Texas 77087

-----------------------

**(713) 645-7894**
**(713) 645-7777 Facsimile**

**RALPH R. MARTINEZ**
Board Certified in Criminal Law
Board Certified in Criminal Appellant
Texas Board of Legal Specialization

**LAURA S. MARTINEZ**
Member of the College of the
State Bar of Texas

October 24, 2015

Kelley Reyes
Chief Deputy Clerk
Court of Criminal Appeals
Supreme Court Building
201 West 14th Street, Room 106
Austin, Texas 78701

*Via* FedEx: 8659 0826 1929

Re:   Prince Thomas-Harris; WR-83,896-01
        Rigoberto Guerrero; WR-83,899-01

Dear Ms. Reyes:

Enclosed please find a courtesy copy of the above mentioned Petitioners. In regards to Rigoberto Guerrero, I filed a prior 11.07 Writ on his behalf; however, that Writ was subsequently dismissed and has been refiled. This Petition was dismissed for non compliance with Tex. App. Rule 73.1(f) (word count certificate).

I anticipate the same problem with Prince Thomas-Harris and my courtesy copy does comply with Tex R. App. Proc. 73.1(f). Hopefully, this will avert a dismissal.

As per our discussion on 10/14/15, I hope that my clients' Petitions can be considered by the Court now that I am in compliance with Rule 73.1(f). I appreciate your help and courtesy. Thank you.

RECEIVED IN
COURT OF CRIMINAL APPEALS

OCT 26 2015

Abel Acosta. Clerk

Sincerely,

Ralph R. Martinez
Attorney at Law

RRM/ra

83,899-01

# IN THE COURT OF CRIMINAL APPEALS
## OF TEXAS

## APPLICATION FOR WRIT OF HABEAS CORPUS
## SEEKING RELIEF FROM FINAL FELONY CONVICTION
## UNDER CODE OF CRIMINAL PROCEDURE, ARTICLE 11.07

PETITIONER RIGOBERTO GUERRERO JR.
TDCJ-CID NUMBER 01742548
ELLIS UNIT TEXAS DEPARTMENT OF
CRIMINAL JUSTICE
HUNTSVILLE, TEXAS

PROCEEDINGS BELOW:
Direct Appeal:   No. 05-1101298-CR
Fifth District Court of Appeals
Dallas, Texas
Trial Court:   Cause No. 059446
15th Judicial District Court
Grayson County, Texas

REPRESENTED BY: RALPH R. MARTINEZ
TBA: 13143600
2900 Woodridge, Suite 202
Houston, Texas 77087
713-645-7894
713-645-777-Fax

# IN THE COURT OF CRIMINAL APPEALS
## OF TEXAS

## APPLICATION FOR WRIT OF HABEAS CORPUS
## SEEKING RELIEF FROM FINAL FELONY CONVICTION
## UNDER CODE OF CRIMINAL PROCEDURE, ARTICLE 11.07

PETITIONER RIGOBERTO GUERRERO JR.
TDCJ-CID NUMBER 01742548
ELLIS UNIT TEXAS DEPARTMENT OF
CRIMINAL JUSTICE
HUNTSVILLE, TEXAS

PROCEEDINGS BELOW:
Direct Appeal:  No. 05-1101298-CR
                Fifth District Court of Appeals
                Dallas, Texas
Trial Court:    Cause No. 059446
                15th Judicial District Court
                Grayson County, Texas

REPRESENTED BY: RALPH R. MARTINEZ
                TBA: 13143600
                2900 Woodridge, Suite 202
                Houston, Texas 77087
                713-645-7894
                713-645-777-Fax

COURT OF CRIMINAL APPEALS OF TEXAS
APPLICATION FOR A WRIT OF HABEAS CORPUS
SEEKING RELIEF FROM FINAL FELONY CONVICTION
UNDER CODE OF CRIMINAL PROCEDURE, ARTICLE 11.07

## INSTRUCTIONS

1.  You must use the complete form, which begins on the following page, to file an application for a writ of habeas corpus seeking relief from a final felony conviction under Article 11.07 of the Code of Criminal Procedure. (This form is not for death-penalty cases, probated sentences which have not been revoked, or misdemeanors.)

2.  The district clerk of the county in which you were convicted will make this form available to you, on request, without charge.

3.  You must file the entire writ application form, including those sections that do not apply to you. If any pages are missing from the form, or if the questions have been renumbered or omitted, your entire application may be dismissed as non-compliant.

4.  You must make a separate application on a separate form for each judgment of conviction you seek relief from. Even if the judgments were entered in the same court on the same day, you must make a separate application for each one.

5.  Answer every item that applies to you on the form. Do not attach any additional pages for any item.

6.  You must include all grounds for relief on the application form as provided by the instructions under item 17. You must also briefly summarize the facts of your claim on the application form as provided by the instructions under item 17. Each ground shall begin on a new page, and the recitation of the facts supporting the ground shall be no longer than the two pages provided for the claim in the form.

7.  Legal citations and arguments may be made in a separate memorandum that complies with Texas Rule of Appellate Procedure 73 and does not exceed 15,000 words if computer-generated or 50 pages if not.

8.  You must verify the application by signing either the Oath Before Notary Public or the Inmate's Declaration, which are at the end of this form on pages 11 and 12. You may be prosecuted and convicted for aggravated perjury if you make any false statement of a material fact in this application.

9.  When the application is fully completed, mail the original to the district clerk of the county of conviction. Keep a copy of the application for your records.

10. You must notify the district clerk of the county of conviction of any change in address after you have filed your application.

Case No. _____
(The Clerk of the convicting court will fill this line in.)


# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## APPLICATION FOR A WRIT OF HABEAS CORPUS
## SEEKING RELIEF FROM FINAL FELONY CONVICTION
## UNDER CODE OF CRIMINAL PROCEDURE, ARTICLE 11.07


**NAME:** Rigoberto Guerrero Jr.

**DATE OF BIRTH:** August 14, 1980

**PLACE OF CONFINEMENT:** Ellis Unit

**TDCJ-CID NUMBER:** 01742548          **SID NUMBER:** 06396244

**(1)** **This application concerns** (check all that apply):

    ☒ **a conviction**         ☐ **parole**

    ☒ **a sentence**         ☐ **mandatory supervision**

    ☐ **time credit**         ☐ **out-of-time appeal or petition for discretionary review**

**(2)** **What district court entered the judgment of the conviction you want relief from?** (Include the court number and county.)

    15th Judicial District Court of Grayson County, Texas

**(3)** **What was the case number in the trial court?**

    059446

**(4)** **What was the name of the trial judge?**

    Honorable Jim Fallon

(5)  Were you represented by counsel?  If yes, provide the attorney's name:

Jack Louis McGowen

(6)  What was the date that the judgment was entered?

September 14, 2011

(7)  For what offense were you convicted and what was the sentence?

Injury to a child, Fifty years and Ten Thousand Dollar Fine

(8)  If you were sentenced on more than one count of an indictment in the same court at the same time, what counts were you convicted of and what was the sentence in each count?

N/A

(9)  What was the plea you entered? (Check one.)

☐ guilty-open plea        ☐ guilty-plea bargain
☒ not guilty             ☐ *nolo contendere*/no contest

If you entered different pleas to counts in a multi-count indictment, please explain:

(10)  What kind of trial did you have?

☐ no jury                 ☒ jury for guilt and punishment
                          ☐ jury for guilt, judge for punishment

2

**(11)** Did you testify at trial? If yes, at what phase of the trial did you testify?

Guilt Innocence phase and Sentencing Phase

**(12)** Did you appeal from the judgment of conviction?

☒ yes                    ☐ no

If you did appeal, answer the following questions:

**(A)** What court of appeals did you appeal to?    Fifth Supreme Judicial District of Texas

**(B)** What was the case number?    No. 05-11-01298-CR

**(C)** Were you represented by counsel on appeal? If yes, provide the attorney's name:

Jason Butscher

**(D)** What was the decision and the date of the decision?    Affirmed

**(13)** Did you file a petition for discretionary review in the Court of Criminal Appeals?

☐ yes                    ☒ no

If you did file a petition for discretionary review, answer the following questions:

**(A)** What was the case number?    _____

**(B)** What was the decision and the date of the decision?    _____

**(14)** Have you previously filed an application for a writ of habeas corpus under Article 11.07 of the Texas Code of Criminal Procedure challenging *this conviction*?

☐ yes                    ☒ no

If you answered yes, answer the following questions:

**(A)** What was the Court of Criminal Appeals' writ number?    _____

3

(B)   What was the decision and the date of the decision?   _____

(C)   Please identify the reason that the current claims were not presented and could not have been presented on your previous application.

_____

_____

_____

_____

(15)   Do you currently have any petition or appeal pending in any other state or federal court?

☐ yes                              ☒ no

If you answered yes, please provide the name of the court and the case number:

_____

(16)   If you are presenting a claim for time credit, have you exhausted your administrative remedies by presenting your claim to the time credit resolution system of the Texas Department of Criminal Justice? (This requirement applies to any final felony conviction, including state jail felonies)

☐ yes                              ☐ no

If you answered yes, answer the following questions:

(A)   What date did you present the claim?   _____

(B)   Did you receive a decision and, if yes, what was the date of the decision?

_____

If you answered no, please explain why you have not submitted your claim:

_____

_____

_____

_____

_____

(17)  Beginning on page 6, state *concisely* every legal ground for your claim that you are being unlawfully restrained, and then briefly summarize the facts supporting each ground. You must present each ground on the form application and a brief summary of the facts. *If your grounds and brief summary of the facts have not been presented on the form application, the Court will not consider your grounds.* If you have more than four grounds, use pages 14 and 15 of the form, which you may copy as many times as needed to give you a separate page for each ground, with each ground numbered in sequence. The recitation of the facts supporting each ground must be no longer than the two pages provided for the ground in the form.

You may include with the form a memorandum of law if you want to present legal authorities, but the Court will *not* consider grounds for relief set out in a memorandum of law that were not raised on the form. The citations and argument must be in a memorandum that complies with Texas Rule of Appellate Procedure 73 and does not exceed 15,000 words if computer-generated or 50 pages if not. If you are challenging the validity of your conviction, please include a summary of the facts pertaining to your offense and trial in your memorandum.

**GROUND ONE:**

Denial of Effective Assistance of Counsel

**FACTS SUPPORTING GROUND ONE:**

Trial counsel was ineffective for not requesting the Court to appoint an expert medical witness or

consultant or to use funds to hire said expert to assist counsel in cross examination of State medical

experts or testify as medical experts at trial given the existence of a medical condition in complainant

that may have caused the injuries ascribed to defendant's actions.

6

**GROUND TWO:**

Whether the prosecutor's remarks comparing Applicant to "Casey Anthony" violated Applicants Due Course of Law Rights under Tex. Const. Art. I. §

10 and the Fifth and Fourteenth Amendments of the United States Constitution.

**FACTS SUPPORTING GROUND TWO:**

During the prosecutors closing argument he compared Applicant to

"Casey Anthony" a notorious and publicized criminal case of child abuse.

No record of this comment or objection exists but witness   affidavits

attached as exhibits attest to its occurrence.

8

## GROUND THREE:

Trial counsel was ineffective in representing Petitioner by not properly objecting to and insuring that both the objection and

prosecutor's closing argument comparing Petitioner to "Casey Anthony" was not recorded.

## FACTS SUPPORTING GROUND THREE:

The prosecutor in this case argued his closing argument that Petitioner was comparable to "Casey

Anthony," an infamous and alleged child abuser whose case was prominent in the media during

Petitioner's trial. This argument is attested to by several witnesses including in Exhibit "A" of this

Petition. The trial counsel did not properly object to or ensure the statement was recorded.

10

## GROUND FOUR:

Appellate counsel did not object to the exclusion of the prosecutor's closing argument to "Casey Anthony" pursuant to

Tex.R.App. P. 34.5(b)(1) or request the record be supplemented pursuant to Tex. R. App. P. 34(L)(1).

## FACTS SUPPORTING GROUND FOUR:

The prosecutor in this case argued his closing argument that Petitioner was comparable to "Casey

Anthony," an infamous and alleged child abuser whose case was prominent in the media during

Petitioner's trial. This argument is attested to by several witnesses including in Exhibit "A" of this

Petition. The trial counsel did not properly object to or ensure the statement was recorded.

13

**GROUND:**

_____

_____

**FACTS SUPPORTING GROUND:**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

14

15

**WHEREFORE, APPLICANT PRAYS THAT THE COURT GRANT APPLICANT RELIEF TO WHICH HE MAY BE ENTITLED IN THIS PROCEEDING.**

**VERIFICATION**

This application must be verified or it will be dismissed for non-compliance. For verification purposes, an applicant is a person filing the application on his or her own behalf. A petitioner is a person filing the application on behalf of an applicant, for example, an applicant's attorney. An inmate is a person who is in custody.

The inmate applicant must sign either the "Oath Before a Notary Public" before a notary public or the "Inmate's Declaration" without a notary public. If the inmate is represented by a licensed attorney, the attorney may sign the "Oath Before a Notary Public" as petitioner and then complete "Petitioner's Information." A non-inmate applicant must sign the "Oath Before a Notary Public" before a notary public unless he is represented by a licensed attorney, in which case the attorney may sign the verification as petitioner.

A non-inmate non-attorney petitioner must sign the "Oath Before a Notary Public" before a notary public and must also complete "Petitioner's Information." An inmate petitioner must sign either the "Oath Before a Notary Public" before a notary public or the "Inmate's Declaration" without a notary public and must also complete the appropriate "Petitioner's Information."

**OATH BEFORE A NOTARY PUBLIC**

STATE OF TEXAS

COUNTY OF _____

_____, being duly sworn, under oath says: "I am the applicant / petitioner (circle one) in this action and know the contents of the above application for a writ of habeas corpus and, according to my belief, the facts stated in the application are true."

_____
Signature of Applicant / Petitioner (circle one)

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____, 20_____.

_____
Signature of Notary Public

16

**PETITIONER'S INFORMATION**

Petitioner's printed name:  Ralph R. Martinez (Representing Applicant Rigoberto Guerrero, Jr.)

State bar number, if applicable: 13143600

Address:  2900 Woodridge Suite 202

 Houston, Texas 77087

Telephone: 713-645-7894

Fax: 713-645-7777

**INMATE'S DECLARATION**

I, Rigoberto Guerrero , am the applicant / petitioner (circle one) and being presently incarcerated in Ellis Unit TDCJ-CID , declare under penalty of perjury that, according to my belief, the facts stated in the above application are true and correct.

Signed on Apr 20 May 16 , 20 14 .

X Rigoberto Guerrero Jr
Signature of Applicant / Petitioner (circle one)

17

## PETITIONER'S INFORMATION

Petitioner's printed name:  <u>Ralph R. Martinez (Representing Applicant Rigoberto Guerrero, Jr.)</u>

Address:  <u>2900 Woodridge, Suite 202</u>

<u>Houston, Texas 77087</u>

_____

Telephone:  <u>713-645-7894</u>

Fax:  <u>713-645-7777</u>

Signed on _____, 20____ .

_____
Signature of Petitioner

18

# MEMORANDUM OF LAW

# AND

# POINTS AND AUTHORITIES

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF

RIGOBERTO GUERRERO'S 11.07 C.C.P. WRIT OF HABEAS COURPUS

ISSUE PRESENTED

## I. Whether Trial Counsel And Appellate Counsel Effectively Represented Petitioner

### a. Ineffective Assistance of Counsel at Trial

Introduction

The right to be represented by counsel is by far the most important of a defendant's constitutional rights because it affects the ability of a defendant to assert a myriad of other rights. *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158.

The right to the assistance of counsel is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 10 of the Texas Constitution. This right to the assistance of counsel has long been understood to include a "right to the effective assistance of counsel." *See, McMann v. Richardson*, 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). The integrity of our criminal justice system and the fairness of the adversary criminal process is assured only if an accused is

represented by an effective attorney. *See, United States v. Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981). Absent the effective assistance of counsel "a serious risk of injustice infects the trial itself." *Cuyler v. Sullivan*, 446 U.S. 335, 343, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980). Thus, a defendant is constitutionally entitled to have effective counsel acting in the role of an advocate. *See, Anders v. California*, 386 U.S. 738, 743, 87 S. Ct. 1396, 1399, 18 L.Ed.2d 493 (1967).

## The Legal Standard

The United States Supreme Court in *Strickland v. Washington*, 466 U. S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984) established the federal standard for determining whether an attorney rendered reasonably effective assistance of counsel. The Texas Court of Criminal Appeals in *Hernandez v. State*, 726 S. W.2d 53, 57 (Tex. Crim. App. 1986) adopted the *Strickland* test as the proper test under state law to gauge the effectiveness of counsel. Pursuant to that test the defendant must show that counsel's performance was deficient; that is, a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. In addition, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064.

The purpose of the *Strickland* two part test is to judge whether counsel's conduct so compromised the proper functioning of the adversarial process that the trial cannot be said to have produced a reliable result. *Thompson v. State*, 9 S.W.3d 808, 812-13 (Tex. Crim. App. 1999) (citing *McFarland v. State*, 845 S.W.2d 824, 843 (Tex. Crim. App. 1992)).

The *Strickland* test applies to appointed and retained counsel alike. *See, Cuyler v. Sullivan, supra* at 344, 100 S.Ct. at 1716. It also applies to all stages of a criminal trial. *See, Hernandez v. State,* 988 S.W.2d 770 (Tex. Crim. App. 1999)(*Strickland* applies to claim of deficient attorney performance at noncapital sentencing proceeding). It applies when evaluating an attorney's performance in connection with a guilty plea. *See, Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)(prejudice prong of *Strickland* requires defendant to show that but for counsel's errors he would not have entered a guilty plea). It even applies to an attorney's performance in handling an appeal. *See, Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985)(due process requires that defendant have effective assistance of counsel on his first appeal).

## Exceptions to Strickland

These are some errors that "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified" thus making it unnecessary to establish the prejudice prong of *Strickland. United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984). Prejudice is presumed in situations where the likelihood of counsel having provided effective assistance is extremely small such as where counsel failed completely to subject the prosecution's case to "meaningful adversarial testing." *Id.* at 660, 104 S.Ct. at 2047 (citing in illustration *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)). According to the Court of Criminal Appeals, it is unnecessary for a defendant to meet the prejudice requirement of *Strickland* if he was actually or constructively denied the assistance of counsel altogether, if counsel was prevented from assisting the accused at a critical stage of the proceedings because of some type of state interference, or if counsel was burdened by an actual conflict of interest which adversely affected counsel's performance. *Mitchell v. State,* 989 S.W.2d 747, 748 (Tex. Crim. App. 1999). "Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *United States v. Cronic, supra* at 659 n. 26,

104 S.Ct. at 2047 n. 26. In other words, in order for the presumption of prejudice to apply the attorney must completely fail to challenge the prosecution's entire case, not just elements of it. *Haynes v. Cain*, 298 F.3d 375, 380, 382 (5th Cir. 2002) en banc; also see *Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002) (noting that difference between situations addressed by *Strickland* and *Cronic* is "not of degree but of kind.").

Raising Ineffective Assistance

Rule 33.1(a) of the Texas Rules of Appellate Procedure generally requires that a complaint be presented to the trial court "by a timely request, objection, or motion" as a prerequisite to raising the complaint on direct appeal. TEX. R. APP. P. 33.1(a). There are, however, many practical difficulties with requiring a defendant to raise the issue of ineffective assistance of counsel at the time of trial or even in a motion for new trial. *See, Robinson v. State,* 16 S.W.3d 808, 810 (Tex. Crim. App. 2000). The biggest difficulty is that there is generally no real opportunity to adequately develop the record for appeal at this time. *Id.* This creates a usually insurmountable hurdle to raising an ineffective assistance claim on direct appeal. "Rarely will a reviewing court be provided with the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits

of the [ineffective assistance] claim...". *Thompson v. State,* 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Thus, for most ineffective assistance claims, a writ of habeas corpus is the preferred method for raising the issue. *Ex parte Torres,* 943 S.W.2d 469, 475 (Tex. Crim. App. 1997). For a multitude of reasons, ineffective assistance claims are excepted from the general rule of error preservation set forth in Rule 33.1(a) and may be raised in an application for writ of habeas corpus even if not raised first in the trial court. *Robinson v. State, supra* at 812-13.

This is not to say that an ineffective assistance claim may not be raised in the trial court or on direct appeal, it can. For example, such a claim may be raised in a motion for new trial. *Reyes v. State,* 849 S.W.2d 812, 815 (Tex. Crim. App. 1993).

Burden of Proof

The burden of proving ineffective assistance of counsel rests on the convicted defendant by a preponderance of the evidence. *Haynes v. State*, 790 S.W.2d 824, 827 (Tex. Crim. App. 1990). In order to determine whether the defendant has met this burden, the reviewing court looks to the totality of the representation and the particular circumstances of the case in evaluating the reasonableness of an attorney's conduct. *See, Ex parte Felton*, 815 S.W.2d 733,

735 (Tex. Crim. App. 1991). The review conducted of defense counsel's representation is "highly deferential and presumes that counsel's actions fell within a wide range of reasonable assistance." *Mallett v. State,* 65 S.W.3d 59, 63 (Tex. Crim. App. 2001)(citing *Tong v. State,* 25 S.W.3d 707, 712 (Tex. Crim. App. 2000)). It is the defendant's burden to overcome this presumption by proving his ineffective assistance of counsel claim by a preponderance of the evidence. *McFarland v. State,* 845 S.W.2d 824, 843 (Tex. Crim. App. 1992); *Moore v. State,* 694 S.W.2d 528, 531 (Tex. Crim. App. 1985); *also see, United States v. Cronic, supra* at 658, 104 S.Ct. at 2046 (the burden rests on the accused to demonstrate a constitutional violation).

The Court of Criminal Appeals emphasized in *Thompson v. State, supra* that a claim of ineffective assistance of counsel must be supported by a record containing direct evidence as to why counsel took the actions or made the omissions relied upon as the basis for the claim. *Id.* at 813-14.; *accord, Busby v. State,* 990 S.W.2d 263, 268-69 (Tex. Crim. App. 1999)(ordinarily the strong presumption that an attorney's decisions were acceptable trial strategy cannot be overcome without evidence in the record as to the attorney's reasons for the decisions). While there may be some actions that unquestionably fall outside the spectrum of objectively reasonable trial strategy, generally, the Court of Criminal Appeals requires a defendant to offer evidence from his attorney

explaining his actions in order to overcome the presumption that counsel acted pursuant to a reasonable trial strategy. *See, Garcia v. State,* 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)(court will not conclude challenged conduct constituted deficient performance unless conduct was so outrageous that no competent attorney would have engaged in it); *also see, Thompson v. State, supra* at 816 (Meyers, J., dissenting)(inconceivable that defense counsel could have had a reason for failing to object to certain hearsay that would fall within the range of objectively reasonable trial strategy). It should be kept in mind, however, that simply labeling an attorney's actions "trial strategy" does not insulate the attorney from a finding of ineffective assistance of counsel. An attorney's strategy can be so ill-chosen as to render a trial fundamentally unfair. *See, United States v. Rusmisel,* 716 F.2d 301, 310 (5th Cir. 1983). As the Supreme Court explained in *Strickland,* strategy decisions should be judged by an *objective* standard of reasonableness. *Strickland v. Washington, supra,* 466 U.S. 687-88; 104 S.Ct. at 2064 (emphasis added).

Once a convicted defendant establishes that his attorney's actions were objectively unreasonable, he must still prove that he was prejudiced by his attorney's actions. To establish prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.

S. at 694, 104 S.Ct. at 2068. The focus of the prejudice component is whether counsel's deficient performance renders the result of the trial unreliable or fundamentally unfair. *Id.* at 687, 104 S.Ct. at 2064. It is not enough to argue that the attorney's errors had some conceivable effect on the outcome of the proceeding, rather the convicted defendant must establish a "reasonable probability" of actual prejudice. *Id.* at 693, 104 S.Ct. at 2067. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

While a convicted defendant must establish actual prejudice from his attorney's conduct, the State cannot avoid the consequences of a finding of ineffective assistance by arguing that the prejudice is de minimus. For example, any amount of additional time in prison constitutes prejudice. *Glover v. United States,* 531 U.S. 198, 203, 121 S.Ct. 696, 700, 148 L.Ed.2d 604 (2001).

This standard does not require error free or perfect counsel. Ex parte Briggs, 187 S.W. 3d 458, 466-467 (Tex. Crim. App. 2005). Nor, will courts isolate separate or portions of counsel's performance in assessing a defendant's right to effective representation. Ex parte Welborn, 785 S.W.2d 391, 393 (Tex. Crim App. 1990); Johnson v. State, 629 S.W. 2d 731, 736 (Tex. Crim. App. 1981). However, even if no one instance alone is sufficient proof of ineffective assistance of counsel, counsel's performance as a whole may

compel such a finding. Ex parte Welborn, supra, Winn v. State, 871 S.W. 2d 756, 764-765 (Tex App.-Corpus Christi; 1993, no pet.) Conversely, it is possible that a single error of omission or commission by trial counsel constitutes ineffective assistance of counsel. Jackson v. State, 766 S.W.2d 504, 510 (Tex. Crim. App. 1985) (modified on other grounds on remand from the United States Supreme Court, Jackson v. State, 766 S.W.2d 518 (Tex. Crim. App. 1988).

b.     Failure to Investigate, Hire Experts, and Develop A Viable Defense

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Ex Parte Briggs, 187 S.W.3d 458, 466-467 (Tex. Crim. App. 2005). This duty requires counsel to promptly investigate the circumstances of the case and explore all avenues likely to lead to facts relevant to the particular merits of the case. Id. at 467. Also, in many cases counsel must seek out experts in a given case, consult those experts in preparing the case and examining expert witnesses for the State, and utilizing expert testimony in defending a client. Id. at 469.

Counsel also has a professional duty to fully investigate and advance a client's viable defenses with or without regard to the necessity of expert assistance Mc Farland v. State, 928 S.W. 2d 482, 501 (Tex. Crim. App. 1996); Jackson v. State, 857 S.W.2d 678, 683 (Tex. App.-Houston [14th Dist.] 1993).

Furthermore, where circumstances necessitate it, trial counsel is obligated to seek out expert assistance to assist in cross-examination if the State's expert witnesses or secure expert testimony in order to adequately develop a client's viable defense. Wright v. State, 223 S.W.3d 36, 43-44 (Tex. App.-Houston [1st Dist.] 2006).

Counsel in Petitioner's case rendered ineffective representation of counsel. Trial counsel's performance was deficient because he did not avail himself of the opportunity to explain that complainant's apparent injuries were actually manifestations of a low vitamin D medical condition. Circumstances suggest that complaint's medical condition constituted a viable defense in Petitioner's case. The presence of this condition in complainant was attested to by the comments by the prosecutor and defense counsel to the Court at the pretrial hearing in the case (R.-Vol. II p. 9, 14, 17, 18). Even though the prosecutor dismissed the viability of complainant's condition as a case of injuries, trial counsel was on notice that the condition in complainant existed. Nevertheless, trial counsel did not employ an expert witness to assess the viability of the defense, assist counsel in cross-examining medical personnel in the case, or provide an expert witness in the case to demonstrate the potency of the medical cause defense. Even more unbelievable is that the complainant's half-brother, Lucas Guerrero, suffered from the same medical condition that

Mathew Guerrero experienced. In addition, Petitioner was previously charged with child abuse against Lucas but the charges were dismissed when the State ascertained the apparent injuries that Lucas exhibited were a result of the medical condition of Lucas, the same condition that Mathew suffered from (R.-Vol. II p. 9, 14, 17, 18). Counsel knew about Petitioners experience with Lucas, knew Mathew suffered from the same condition, knew charges involving Lucas against Petitioner were dropped, and yet, never explored the availability of this condition in Mathew as a defense.

The failure to secure expert assistance in advancing a viable defense, when such assistance is necessary, constitutes deficient performance by counsel. In Ex Parte Briggs, the sole issue in the case was whether the complainant was murdered or if his death was a result of natural causes, exacerbated by improper medical treatment. Ex Parte Briggs, 187 S.W. 3d at 468. The Court in Ex Parte Briggs held that counsel was deficient because he failed to produce an expert to resolve the cause of death issue. Id. Furthermore, the Court concluded subpoena doctors who had treated the victim and introduced the medical records and history through those witnesses. Id. In addition, defense counsels' failure to call experts was a financial decision that could have been ameliorated by an application for indigency court paid funds to hire an expert. Id.

The courts have found counsel deficiency for failure to investigate and develop a defense. In Wright v. State, the Court held that counsel was deficient because he failed to advance the defensive theory of undue influence on a child and the child's fabrication of child abuse charges. Wright v. State, 223 S.W.3d at 44. In that case, the Court held counsel should have utilized an expert to establish interviews deviated from standard interview protocol and the potential of false allegations of child abuse in divorce proceedings. Id at 45.

In Jackson v. State, the Court held counsel was deficient for his failure to investigate and develop his client's defense of mental illness and other pertinent defenses despite knowing that the defense existed. Jackson v. State, 857 S.W.2d at 683.

In Petitioner's case, trial counsel was deficient because he failed to investigate this case and did not develop viable defenses. Trial counsel had notice that the complainant had low vitamin D levels, a medical condition that causes bone structure to become brittle and exhibit characteristics of child abuse. In fact, trial counsel had knowledge that his client was wrongfully charged with child abuse involving complainant's halfbrother, Lucas Guerrero. Ultimately the child abuse charges that involved Lucas were dismissed against Petitioner after authorities determined that Lucas suffered from the medical

condition that led to a misdiagnoses of child abuse (R.-Vol. II p. 9, 14, 17, 18). Moreover, trial counsel had possession of a medical report prepared by Dr. Suzanne DaKill that trial counsel introduced as evidence that indicated the complainant had low vitamin D levels (R.-Vol. VI p. 44-46). In addition, the trial court seemed to suggest trial counsel should employ a medical expert in the case or petition the court for indigent funds to appoint a medical expert (R.-Vol. II p. 7, 15). Trial counsel had notice of potential medical issues dealing with "child abuse like" symptoms involving Lucas and Mathew Guerrero (R.-Vol. II p. 13, 17, 18).

During Petitioner's trial, trial counsel failed to cross-examine Dr. Jill Breeze, the medical doctor that has treated Mathew Guerrero since birth (R.-Vol. VI p. 6). During cross-examination of Dr. Breeze trial counsel never questioned the doctor regarding Mathew's low vitamin D level impact on Mathew's bone structure and potential for creating child abuse symptoms or if the medical condition made the child susceptible to injury and fracture (R.-Vol. VI p. 15-17). In addition, trial counsel never subpoenaed or introduced into evidence Mathew's medical records that Dr. Breeze possessed. Also, at no time did trial counsel introduce a medical expert to explain Dr. Breeze medical records (R.-Vol. VI p. 15-17).

The records also indicates that Dr. Suzanne DaKill concluded in her

medical report concerning Mathew that his vitamin D levels were not significantly low and had nothing to do with the child's injuries (R.-Vol. VI p. 45-46). Trial counsel, despite having at least a year notice of Mathew's medical condition, never challenged Dr. Dakill's testimony with a defense medical expert or a consulting expert to help cross-examine Dr. Dakill (R.-Vol. VI p. 15-17). Also, trial counsel failed to re-cross Dr. DaKill on this issue even after the testimony of Dr. DaKill regarding the effect of low vitamin D levels of Mathew was raised on the state's re-direct (R.-Vol. VI p. 48).

The failure of defense counsel to utilize an expert as a witness to counter Dr. DaKill's contention that Mathew Guerrero's injuries were not a product of Mathew's low vitamin D levels deprived Petitioner of a viable defense. Moreover, trial counsel did not utilize a consulting expert to help develop this defense relating to low vitamin D levels and assist trial counsel in cross-examining Dr. DaKill and Dr, Breeze on this issue. These circumstances, especially failing to petition the court for funds to pay for an expert or heed the court's suggestions that an expert could be requested by the defense on an indigency basis constituted a failure to investigate and develop a defense rendering trial counsel's performance deficient. Ex parte Briggs, 187 S.W.3d at 468. This deficiency in this case exacerbated by trial counsel's failure to cross examine Dr. DaKill on the issue of the effect of Mathew's medical

condition on the nature of his injuries. This failure to cross-examine Dr. DaKill was even more detrimental to Petitioner because trial counsel failed to cross-examine Dr. DaKill after she testified Mathew's medical condition did not contribute to his injuries. The failure to impeach Dr. DaKill constituted deficient performance. Ex Parte Ybarra, 629 S.W.2d 943, (Tex. Crim. App. 1982). In essence, counsel's failure to cross-examine or offer medical expert evidence to challenge Dr. DaKill's conclusions regarding the medical condition issue was tantamount to accepting the State's theory in this case that Mathew's injuries were not caused in any way by his medical condition that makes counsel's representation deficient. Craig v. State, 847 S.W.2d 434, (Texas. App.-El Paso 1993, no pet.).

Trial counsel's deficient performance prejudiced Petitioner's case to the extent that counsel's errors were so serious as to deprive Petitioner of a fair trial whose result was reliable. Where trial counsel in a given case, such as Petitioner's case, fails to subpoena the treating doctors and their medical records that establish a defendant's medical history that impacts or supports a defense theory prejudice exists. Ex parte Briggs, 187 S.W.3d at 469-470. In Petitioners case trial counsel's failure to investigate and subpoena the complainant's low level vitamin D and hire experts to explain that complainant's injuries, even in part, could have resulted from the existence of

this medical condition makes counsel's deficient performance more prejudicial. Id. at 469. The failure to advance a viable defense or potentially viable defense by investigating a defendant's medical history, present that evidence to support that defense, and utilize expert testimony or at least utilize a consulting expert to advance a defense can be prejudicial. *Wright v. State*, 223 S.W.3d at 43-44.

In short, trial counsel's failure to even request medical expert to testify at trial or to serve as a consultant was ineffective assistance of counsel because the medical history of the complainant may have caused the injuries Petitioner was charged for committing. Given this history and the presence at trial of several State experts that were not countered by defense experts defective representation occurred and resulted in prejudice to Petitioner. The presence of defense experts was "likely to be a significant factor" at trial. <u>Ake v. Oklahoma</u>, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985); <u>Ex Parte Flores</u>, 387 S.W.3d 626, 634 (Tex. Crim. App. 2012); <u>Ex Parte Jimenez</u>, 364 S.W.3d 866, 876 (Tex. Crim. App. 2012).

In a recent case, the Court of Criminal Appeals held that trial counsels were ineffective for failure to present an available medical expert witness on sodium intoxication that also contradicted the theories of the defendant's guilt advanced by the State especially where trial counsel's decision not to call that

expert was not a result of any thoroughly investigated trial strategy and a reasonable decision by defense attorneys. Ex Parte Overton, 444 S.W. 3d 632, 640 (Tex. Crim. App. 2014). Furthermore, in Overton the Court concluded that with that testimony the State's experts would have been refuted and the cause of the complainant's death was result of a medical condition and not to defendant's conduct. Id. at 641.

In Petitioner's case defense counsel failed to call medical experts who treated Mathew Guerrero and that evidence in all reasonable probability would have resulted in a different outcome.

II.   Improper Closing Argument

It is error to argue outside the record where the argument injects new and harmful facts. Baker v. State, 177 S.W. 3d 113, 125-126 (Tex. App.-Houston [1st Dist.] 2005, no pet.). Argument that injects new facts outside the record is reversible where, in light of the record as a whole, the argument is extreme or manifestly improper. Wright v. State, 178 S.W. 3d 905, 929 (Tex. App.-Houston [14th Dist.] 2005, pet. ref'd). Comparing a defendant or his acts to a notorious criminal is considered an improper and erroneous interjection of facts not in the record that is harmful to the defendant. Gonzalez v. State, 115 S.W. 3d 278, 284-285 (Tex. App.-Corpus Christi 2003, pet ref'd). In Gonzalez the prosecutor compared the defendant to Osame Bin Laden.

In the instant case, the prosecutor, compared Defendant to "Casey Anthony" a well publicized case of a child abuse death that occurred at the time of Defendant's trial. No objection was made and no reference to that comment by the prosecutor exists in the record. However, attached affidavits of witness who lead the argument and also heard the Court "strike the matter from the record".

# CERTIFICATE OF COMPLIANCE

Pursuant to Tex. R. App. Proc. 73.1 (f), undersigned counsel certifies that this petition complies with the type-volume limitations of 5th CIR. R. 32.2.7(b).

1.    Exclusive of the portions exempted by Tex. R. App. Proc. 73.1, this petition contains 4, 156 words printed in a proportionally spaced typeface.

2.    This petition is printed in a proportionally spaced, serif typeface using Times New Roman 14 point font in footnotes produced by Microsoft Word software.

3.    Upon request, undersigned counsel will provide an electronic version of this petition and or a copy of the word printout to the Court.

4.    Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in Tex. R. App. Proc. 73.1 (f), may result in the Court striking this petition and imposing sanctions against the person who signed it.

By: **/S/ RALPH R. MARTINEZ**
RALPH R. MARTINEZ
Attorney for Appellant

# AFFIDAVIT OF DOCTOR

# GOLDER WILSON

# ON

# MEDICAL CONDITION

# OF MATHEW GUERRERO

# AFFIDAVIT

**BEFORE ME**, the undersigned authority, on this day personally appeared _GOLDER WILSON_, who, being by me duly sworn, deposed as follows:

"My name is _GOLDER WILSON_, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I feel Matthew Guerrero has Ehlers-Danlos Syndrome (EDS), a rare inherited condition with disruption of the integrity of structural proteins in skins, ligaments, cartilage, and blood vessels, leading to the fragility of connections tissues.

I do not recall seeing a vitamin D level in Matthew Guerrero; however, further examination of Mathew may be necessary to determine if his vitamin D level are low. Patient with EDS are frequently vitamin D deficient.

Specifically EDS patients may feature atrophic SCARS, multiple bruises, skin splitting and the presence of blue sclerae and epicanthic folds. EDS patients may also exhibit bruising in the body.

_____
Affiant

**SWORN TO AND SUBSCRIBE** before me on the _28th_ day of _January_, 2014.

My commission expires:

_____

ALICIA P TOWLE
My Commission Expires
July 9, 2016

_____
Notary Public, State of Texas
Notary's Printed Name: _Alicia P Towle_

# MEDICAL CONDITION

# OF

# LUCAS GUERRERO



Pediatric Genetics

March 22, 2014

Dr. Malgorzata Gajda
Hilltop Pediatrics
300 N Highland Ave Suite 542
Sherman, TX 75092

RE: Lucas Guerrero  BD: 9-4-1999

Dear Dr. Gajda:

I had seen Lucas Guerrero on March 17, 2014 and feel that he has a form of Ehlers-Danlos syndrome (EDS) type I characterized by tall stature, hypermobility, arthralgia, and some symptoms of paroxysmal orthostatic tachycardia syndrome (POTS). I sent insurance information to the GeneDx company to ascertain self-pay costs for the new exome sequencing test that examines the coding regions of all 23,000 genes. This would include the trio of samples from a child/adult and their two parents. I now have the response from Ms. Alderdice, the genetic counselor for GeneDx that coordinates benefits and sampling for exome sequencing. Her response below indicates a $1117 out-of-pocket costs for this $9000 test, so it may be best to wait until the exome sequencing costs decliners since it is new and we may not receive information that is of practical use for medical management. However, the family could contact Ms. Alderdice or the patient advocate line for further discussion.

If the family wishes to proceed with testing, they could make a follow-up appointment with me so we can fill out the requisitions, draw blood, and send to GeneDx. There is also a network of GeneDx draw locations that can be helpful if relatives live out of town or far from my office in Medical City hospital. If blood is drawn at an outside location, I can forward requisitions for testing to GeneDx. Once the blood is drawn, there will be a 4-5 month wait for results and I will send copies to the family and their doctors as specified. In many cases a follow-up appointment for discussion of these complex results should be considered. I would ask the family to contact Ms. Alderdice or make a follow-up appointment with me to proceed with testing. As always, they should feel free to contact me with further questions or concerns.

```
Dr. Wilson,
For Lucas Guerrero, the out of pocket cost is $3726. With the financial
assistance program, we could reduce this to $1117.8 which could be paid in a 12 month
payment plan if needed. Anyone with any amount out of pocket is strongly encouraged to
call out Patient Advocate Line at 1-866-383-1925. They have been bringing out of pocket
costs down quite a bit lately to make testing affordable to patients. Your patients are
also welcome to give me a call to discuss.Thanks!
Melissa Alderdice, MS, CGC   Neurology Product Specialist
Gene Dx   (P) 214-250-2427   (F) 214-501-5395
malderdice@genedx.com<mailto:malderdice@genedx.com>
```

Sincerely yours

Golder N. Wilson MD, PhD
*Certified in Pediatrics & Medical Genetics*
Information/questions: Phone: 214-797-0031
Email: TheGgnome@aol.com

| Genetics & Metabolism Dysmorphology, birth defects Prenatal counseling | Personalized medicine, prenatal counsel Development delays, mental disability Growth, obesity, ADHD, behavior issues |
|---|---|
| Dallas: Phone 972-566-2500 Medical City Hospital Suite B311 7777 Forest Lane Dallas TX 75230 Fax 972-566-2505 | Plano: Phone 972-312-0440 Miranda Ramirez Pediatrics 3608 Preston Rd, Suite 125 Plano TX 75093 Fax 469-467-9343 |
| More information: www.kinderGgnome.biz ||

cc:
Ralph Martinez Attny
29000 Woodridge Ste 202
Houston TX 77087

Rigoberto, Raquel Guerrero
1212 S Hazelwood St
Sherman TX 75090



Pediatric Genetics

March 18, 2014

Dr. Malgorzata Gajda
Hilltop Pediatrics
300 N Highland Ave Suite 542
Sherman, TX 75092

RE: Lucas Guerrero BD: 9-4-1999

Dear Dr. Gajda:

Thank you for referring Lucas Guerrero who I saw again on March 17, 2014 in our Medical City office for outpatient genetic consultation. Lucas is 14 years old and came in with his grandmother for discussion of genetic testing. **My overall impression was that Lucas has a moderate form of Ehlers-Danlos syndrome (EDS) type I characterized by tall stature, hypermobility, arthralgia, and some symptoms of paroxysmal orthostatic tachycardia syndrome (POTS). I had inquired of the GeneDx company what the family self-pay would be for exome sequencing that examines all 23,000 human genes, and they responded that the family would have minimal out-of-pocket costs. I will now resend their new insurance information to confirm full insurance coverage, and we will try to arrange the exome test for Lucas, his mother in Flower Mound, and his father who is incarcerated in Tennessee Colony Texas. I will send a follow-up letter when we have the out-of-pocket estimates with potential blood draw mechanisms for the parents.**

**PAST MEDICAL HISTORY:** I had previously documented the history of several infantile fractures which resulted in placement with his grandmother since age 1 year. He had some development delays with need for ECI that may have reflected healing from fractures since he has done well in school until recently. He had some physical therapy at age 8-9 years and he has had normal language. Symptoms such as joint popping, arthralgias, fractures in his L foot, and stomach issues suggestive of IBS suggest the diagnosis of EDS, and some urologic issues along with dry eyes have suggested POTS along with dizziness on standing, hypotension, enjoyment of salty foods, occasional fatigue and "brain fog," the latter possibly accounting for some school difficulties. He was told that he has collapsed arches in his feet.

**FAMILY HISTORY:** The previously documented family history indicates that Lucas has half-brothers Jacob and Matthew, the latter with early fractures that in 2009 resulted in his father having criminal charges of child abuse with incarceration. Grandmother (mother of the three boys' father), does not have contact with these other grandchildren, but thinks that Jacob may have had an arm fracture. Grandmother is a nurse working in dialysis and has had several symptoms of EDS—joint pains with flexibility, migraines, menorrhagia, and endometriosis. She has another son in addition to Lucas' father with joint issues and a daughter who has a son, age 9, with flexibility, asthma, and eczema.

**PHYSICAL EXAMINATION:** Lucas was 6-2 ½(90th centile for age) and weighed 163 lbs (50th centile for age) with a head circumference of 22.5 inches (90th centile for age). He continues to grow rapidly (6-1 at his last visit) and has a slender, fit build that will help prevent wear-and-tear joint injury.
**HEENT:** Normal hair pattern and texture with normal head shape; normal facial appearance with no subtle anomalies of the eyes, ears, or jaw..
**Back:** Mild dextroscoliosis in thoracolumbar region with angle of about 5 degrees.
**Extremities:** Normal proportions with normal palmar creases. I previously documented moderately increased joint laxity with Beighton hypermobility scale of 5-6/9). He has long fingers and the thumb-little finger overlap around wrist (Walker-Murdoch) and thumb through fist (Hoffman) signs were positive.
**Skin:** Soft texture with hyperelasticity sufficient to give a 1 inch fold on his forearm.
**Neuro:** No focal neurologic deficits. He is very interactive and conversational with obvious normal intelligence. He has good coordination and balance as judged by tandem walk

**IMPRESSION:** My impression remains that Lucas has a moderate form of Ehlers-Danlos syndrome (EDS) type I with evidence for skeletal, gastrointestinal, and vascular changes. I cannot exclude a form of Marfan syndrome although he has not yet had any aortic or cardiac changes, but the type IV EDS syndrome is unlikely since he does not have a pinched lower face or translucent skin.

**RECOMMENDATIONS:** I will recontact the GeneDx company to ascertain what the self-pay costs would be for exome sequencing (list price fo $9000) based on their new insurance. If covered, we can arrange blood draws for Lucas and his parents, and have urged his grandmother to contact me (email best) with new questions or concerns.

Sincerely yours

Golder N. Wilson MD, PhD
*Certified in Pediatrics & Medical Genetics*
Information/questions: Phone: 214-797-0031
Email: **TheGgnome@aol.com**

| Genetics & Metabolism<br>Dysmorphology, birth defects<br>Prenatal counseling | Personalized medicine, prenatal counsel<br>Development delays, mental disability<br>Growth, obesity, ADHD, behavior issues |
|---|---|
| Dallas: Phone 972-566-2500<br>**Medical City Hospital Suite B311**<br>**7777 Forest Lane**<br>**Dallas TX 75230**<br>Fax 972-566-2505 | Plano: Phone 972-312-0440<br>**Miranda Ramirez Pediatrics**<br>**3608 Preston Rd, Suite 125**<br>**Plano TX 75093**<br>Fax 469-467-9343 |
| More information: www.kinderGgnome.biz ||

cc:
Ralph Martinez Attny
29000 Woodridge Ste 202
Houston TX 77087

Rigoberto, Raquel Guerrero
1212 S Hazelwood St
Sherman TX 75090



Pediatric Genetics

December 12, 2013

Dr. Malgorzata Gajda
Hilltop Pediatrics
300 N Highland Ave Suite 542
Sherman, TX 75092

RE: Lucas Guerrero, BD: 9-4-1999

Dear Dr. Gajda:

Thank you for referring Lucas Guerrero who I saw on December 12, 2013 in our Plano office for outpatient genetic consultation. Lucas is 14 years old and came in with his grandmother for evaluation of a possible connective tissue dysplasia. **My overall impression is that Lucas has a moderate form of Ehlers-Danlos syndrome (EDS) type I characterized by hypermobility, arthralgia, and some symptoms of paroxysmal orthostatic tachycardia syndrome (POTS). I will inquire of the GeneDx company what the family self-pay would be for exome sequencing that examines all 23,000 human genes and has the best chance to define a mutation in one of the >100 genes implicated in connective tissue dysplasias or dysautonomia. I will let the family know in a week and we can arrange blood draws on Lucas and his parents if it is feasible to proceed.**

**PAST MEDICAL HISTORY:** Lucas was a premature baby after a 34-week gestation and had transient jaundice and hypoglycemia. He was bottle-fed with some early feeding difficulties and there was a question of tears in the cornea at one point. At age 2 months he was removed from parental custody after an arm fracture and others in multiple stages of healing were found—apparently vitamin D deficiency was also questioned. His grandmother acquired custody at age 1 year and relates a history of hypotonia with motor delay—he did not walk until age 18 months and he was in ECI. However, the delays may have reflected healing from fractures in that he has done well in school until recently, troubled more by lack of effort than cognitive concerns according to his grandmother. He had some muscle weakness that needed physical therapy at age 8-9 years and he has had normal language.

His muscle weakness may have reflected limitation from joint pain as he has popping joints and arthralgias, particularly in his shoulders. He has been in a boot twice for stress fractures in his L foot. His most severe symptoms are likely due to IBS with severe stomach issues at ages 4-5 years after GE reflux as a baby. He has chronic constipation and Dr. Russo performed a normal endoscopy and biopsy. Also potentially related to dysautonomia are urology issues with need for stents in his ureters and an episode of urosepsis. He also has had significant vision issues with dry eyes and poor vision evaluated at age 6-7 years. He was found to have vitamin A deficiency and now takes 25,000 units per day, also having other fat-soluble vitamin deficiencies such as vitamin K that could reflect bowel malabsorption—he is seeing Dr. Hutchinson of endocrinology and Dr. Russo of GI for these issues. He also has symptoms of POTS with an episode of severe shortness of breath and saw Dr. Zellers of cardiology with monitoring for arrhythmia that was apparently negative. He has dizziness on standing, hypotension, enjoyment of salty foods, occasional fatigue and "brain fog," the latter possibly accounting for some school difficulties. He has not had striae or unusual scars and does not note TMJ pain or popping, obvious scoliosis or pectus. He was told that he has collapsed arches in his feet.

**FAMILY HISTORY:** Family history indicates that Lucas has half-brothers Jacob and Matthew, the latter with early fractures that in 2009 resulted in his father having criminal charges of child abuse with incarceration. Grandmother (mother of the three boys' father), does not have contact with these other grandchildren, but thinks that Jacob may have had an arm fracture. Grandmother is a nurse working in dialysis and has had several symptoms of EDS—joint pains with flexibility, migraines, menorrhagia, and

endometriosis. She has another son in addition to Lucas' father with joint issues and a daughter who has a son, age 9, with flexibility, asthma, and eczema. Otherwise, there are no individuals known to have developmental disability, birth defects, or early onset cancers on either side of the family..

**PHYSICAL EXAMINATION**: Lucas was 6-1 and weighted 156 lbs with a slender, fit build.
**HEENT:** Normal hair pattern and texture with normal head shape; normal facial appearance with no subtle anomalies of the eyes, ears, or jaw..
**Neck and chest:** No webbing or sinuses; mild pectus excavatum
**Heart:** No murmurs--regular rate and rhythm
**Back:** Mild dextroscoliosis in thoracolumbar region with angle of about 5 degrees.
**Extremities:** Normal proportions with normal palmar creases. Moderately increased joint laxity with Beighton hypermobility scale of 5-6/9). He has long fingers and the thumb-little finger overlap around wrist (Walker-Murdoch) and thumb through fist (Hoffman) signs were positive.
**Skin:** Soft texture with hyperelasticity sufficient to give a 1 inch fold on his forearm.
**Neuro:** No focal neurologic deficits. He is very interactive and conversational with obvious normal intelligence. He has good coordination and balance as judged by tandem walk

**IMPRESSION:** My impression is that Lucas has a moderate form of Ehlers-Danlos syndrome (EDS) type I with evidence for skeletal, gastrointestinal, and vascular changes. The latter have manifest mainly as POTS and gastroparesis/irritable bowel syndrome, and I do not see evidence for the Chiari malformation that is more common in EDS. I also cannot exclude a form of Marfan syndrome although he has not yet had any aortic or cardiac changes, but the type IV EDS syndrome is unlikely since he does not have a pinched lower face or translucent skin.

**RECOMMENDATIONS:** I attach information on the EDS spectrum and would suggest return to cardiology if Lucas has more severe POTS symptoms, especially if they interfere with school. Drs. Lee Ann Pearse of pediatric cardiology and Dr. Amer Suleman of adult cardiology are very familiar with POTS. Otherwise, Lucas should follow the joint protection and nutrition approaches outlined in the information, and I am inquiring of the GeneDx company what the self-pay costs would be for exome sequencing (list price fo $9000 but often covered or discounted through insurance). I have urged his grandmother to contact me (email best) with new questions or concerns.

Sincerely yours

Golder N. Wilson MD, PhD
*Certified in Pediatrics & Medical Genetics*
Information/questions: Phone: 214-797-0031
Email: TheGgnome@aol.com

| Genetics & Metabolism Dysmorphology, birth defects Prenatal counseling | Personalized medicine, prenatal counsel Development delays, mental disability Growth, obesity, ADHD, behavior issues |
|---|---|
| Dallas: Phone 972-566-2500 Medical City Hospital Suite B311 7777 Forest Lane Dallas TX 75230 Fax 972-566-2505 | Plano: Phone 972-312-0440 Miranda Ramirez Pediatrics 3608 Preston Rd, Suite 125 Plano TX 75093 Fax 469-467-9343 |
| More information: www.kinderGgnome.biz ||

cc:
Ralph Martinez Attny
29000 Woodridge Ste 202
Houston TX 77087

Rigoberto, Raquel Guerrero
1212 S Hazelwood St
Sherman TX 75090

# Ehlers-Danlos syndrome (EDS) discussion—Dr. Wilson

**What is EDS?** Ehlers and Danlos were dermatologists who in the early 1900s described a syndrome (pattern) caused by lax connective tissue highlighted by patients with hyperelastic skin. In 1977, Dr. Peter Beighton organized intervening literature by postulating 7 EDS types, with type I involving skeletal problems plus extended complications of the bowel and circulatory system, type II showing mainly hypermobility, type III having hypermobility with many stretch marks, and type IV with tight lower facies, thin aged skin, and lethal vessel ruptures. Types V-VII are more localized and rare, affecting gums or producing odd skin lesions. Type IV was erroneously called the "vascular" type even though all forms of EDS can have flexible and fragile blood vessels. Many physicians and geneticists continue to view EDS as a group of rare specific types, but my experience teaches that hypermobility disorders and EDS comprise a spectrum that is as common as diabetes. Most individuals have only hypermobility, a trait that they take for granted and become aware of only when they have frequent sprains or wear-and-tear arthritis. Others have more severe symptoms that can be disabling but not life-threatening, and the clinical diagnosis of EDS emphasizes that patients have a true condition and that their anxiety, fatigue, and chronic pain are real symptoms rather than "in their minds" or branding them as hypochondriacs. The Inspire website (https://www.inspire.com/groups/ehlers-danlos-national-foundation/) is an excellent and patient-oriented source of information.

**Rarer, extreme forms of EDS reflect single gene (autosomal dominant) inheritance:** The severe types of EDS along with other members of the connective tissue dysplasia category like Marfan syndrome (exemplified by an Abe Lincoln build) or osteogenesis imperfecta (OI or brittle bone disease) exhibit autosomal dominant inheritance, meaning that affected individuals have one normal and one abnormal gene. The abnormal gene dominates to cause connective tissue laxity—both genes make protein with the abnormal gene making a deformed protein that interacts with the normal protein like bricks in a wall. The deformed brick (protein) makes the wall wobbly and weak, translating to weaker and flexible skin, joints, and blood vessel walls. Severe forms of EDS and related conditions can be diagnosed by targeted DNA testing—fibrillin gene testing for those with obvious Marfan syndrome, collagen type III testing for those with obvious EDS type IV, collagen I testing for those with obvious OI.

**Most EDS cases are cause by multiple genes and comprise a spectrum**: Most patients with EDS exhibit overlapping symptoms of joint popping/dislocation/injury with later arthritis, soft and elastic skin with unusual scars and bruising, migraines, heavy periods with endometriosis, and dysautonomia (altered function of the autonomic nervous system) with irritable bowel syndrome (IBS) and paroxysmal orthostatic tachycardia syndrome (POTS). In EDS, POTS is due to pooling of blood in lower extremities when standing with dizziness, fainting, fatigue, and "brain fog" (intervals of decreased focus and memory). Diagnosis of EDS among many causes of dysautonomia allows therapy by increasing intravascular volume with hydration and salt to increase brain perfusion. Patients with broader symptoms are likely to have multiple gene changes compatible with multifactorial causation.

**EDS remains a clinical diagnosis**: As of now the diagnosis of EDS is clinical in most cases, meaning documentation of typical histories and physical findings (tall stature, lean build, hypermobility, skin elasticity). Patients can be grouped as hypermobile EDS (HEDS) or classical (CEDS with broad symptoms) but this is greatly oversimplified, as are the 7 types described by Beighton. I tend to group patients with only skeletal symptoms as type II or III (with associated stretch marks/scarring) and those with broader symptoms as type I. Since over 40 genes have been implicated in EDS, we can anticipate over 40 types with overlapping symptoms when DNA testing of multiple genes becomes routine. At present the clinical diagnosis of connective tissue dysplasia or EDS spectrum disorder is reasonable since it will guide patients and physicians to anticipate a broad range of medical complications and refute assumptions about mental illness or hypochondriasis.. The many possible gene changes make single gene (DNA) testing of low yield except in cases with obvious Marfan or EDS IV.

**Gene testing for EDS**: Three levels of gene (DNA) testing include 1) testing for Marfan and related Loeys-Dietz syndromes through LabCorp (~$1600 and usually covered by insurance), 2) a 12-gene panel including Marfan, EDS type IV, and other rare forms ($3600 with guaranteed maximal $100 self-pay over insurance through the GeneDx company), and 3) exome sequencing examining the exons (protein-coding regions)of all 23,000 genes in our genome (rapid parallel/(NextGen sequencing of parent-child trios for $9000 through GeneDx with guaranteed max of $1000 self-pay over insurance). For the latter test, I can send insurance information to GeneDx to ascertain each family's self-pay amount which sometimes is much less than $1000. Sadly, most genetic testing is not covered by Medicaid or Medicare. Even a positive gene test may not lead to different therapy or management.

**EDS therapies**: Arthritis is due to joint hypermobility with wear-and-tear injury (osteoarthritis), not from inflammation like rheumatoid arthritis or that due to lupus and other rheumatic diseases. Thus therapy is preventive with common sense recommendations for joint protection, favoring activities like swimming and avoiding those like long distance running, gymnastics, etc. Patients should remain active with moderate weight-lifting and other reasonable activities to build muscles around the joints, preventing cycles of inactivity with increasing joint stiffness and pain that present as chronic fatigue syndrome or fibromyalgia. The RICE (Rest, Ice, Compression, Elevation) approach to injury can minimize ongoing joint damage, and susceptibility to injury plus slow healing should prompt early orthopedic evaluation to exclude tears and fractures. POTS benefits from hydration (8 glasses fluid per day), salt in the absence of hypertension, and vitamins (C--2g per day, D >1000 units per day, B12--2.5 mg per day, daily multivitamin and mineral preparation). IBS can be helped by avoiding fluids before meals with small feeds and, for some, low gluten.

*MR # 1031083*

# PHYSICIAN REFERRAL
## NOTE: Application cannot be processed without physician referral

ATTENTION: Referring Physician - the following is REQUIRED data:

1) Child's Name and Date of Birth

2) Section A and/or Section B completed in its ENTIRETY for determination of child's eligibility

3) Physician Signature, Date, Medical License Number, and Demographics

If you have any questions regarding the referral and/or services that TSRHC provides, please contact the Patient Access RN at (214) 559-7559 or 1 (800) 595-7604.

Child's name _Guerrero , Lucas Rueben_      Date of birth _09_ / _04_ / _1999_

     Last    First    Middle    (Suffix)      Mo   Day   Yr

## Section A - REQUEST FOR ORTHOPEDIC/MUSCULOSKELETAL EVALUATION (completed by MD)

Diagnosis _Multiple Vitamin Deficiencies_      Date of onset _____

Describe problem or need _Deficient in A, D, E, K - the fat-soluble vitamins. No mal absorption (seen by GI)? □ _____ abeta lipo protein - emia? Now food _____

Pertinent exam findings and history* _NL exam. Remote w/o fractures ruled do non-accidental trauma_

Developmental status (Cognitive, Motor, Social)** _NL_

* Please attach related X-rays, medical records or other clinically significant Information

** Please attach a copy of a developmental screening test, if applicable

PHYSICIAN'S SIGNATURE _____ md      DATE _6/11/13_

PHYSICIAN'S NAME _MICHELE R. Hutchison MD_      MEDICAL LICENSE # _L2947_

     Print or Type

PHYSICIAN'S ADDRESS _____

     Street      Suite #

     City      State      County      ZIP

PHONE (_214_) _458-5959_      FAX (_214_) _458-5963_

E-MAIL _michele.hutchison@utsw.edu_

## Section B - REQUEST FOR LEARNING DISABILITY EVALUATION (completed by MD)

NOTE: The enclosed Educational Background form MUST be completed for application to be processed.

Grade level _____      School name _____      School district _____

Special Education Placement? □ No □ Yes

Purpose of referral _____

Describe learning problem(s) _____

Has previous testing been done? □ No □ Yes   (if yes, note date, place of testing and attach records)

NOTE: Blocked calls are not displayed on this report.
For more information, see Junk Fax Report and the Caller ID Report.

## Last Transaction

| Date | Time | Type | Station ID Caller ID | Duration Digital Fax | Pages | Result |
|------|------|------|---------|----------|-------|--------|
| Jul 31 | 4:42AM | Received | | 0:54 | 2 | OK |
| | | | 9034636830 | N/A | | |

**Note:**

Image on Fax Send Report is set to On

An image of page 1 will appear here for faxes that are sent as Scan and Fax.

Guerrero, Lucas Rueben (MR # 1031083)

## VITAMIN D 25 HYDROXY
**Results**

Status: Final result
5/2/2013 7:32 PM

**Result Notes**

Notes Recorded by Michele R. Hutchison, MD on 5/7/2013 at 2:43 PM
Donna,

Now that Lucas' labs are back, looks like we need to make some changes:

1. Vitamin A is good, no change to that dose.
2. Vitamin D could stand to be increased. He is taking 4000 units/day - of mom has the 2000 unit capsules, then she should increase to 3 capsules a day (6000 units/day).
3. Vitamin K - Not sure why this one is so much higher than usual. He takes 1/4 tab 3 times a week. Reduce the frequency to twice a week.
4. Vitamin E - This is the one we were confused about. I think you determined that he is taking 400 units 5 days a week. His level was low, so we need to increase the dose. I don't think 400 7 days a week will do it - I would give him two capsules 5 days a week.

Because we are changing so many of the dosages, I would feel better if we repeated the labs in 6-8 weeks. (Don't need to repeat the Vit A, as that was normal.)

Thanks

MH

Guerrero, Lucas Rueben (MR # 1031083)

## VITAMIN D 25 HYDROXY
**Results**

Status: Final result
7/5/2013 6:34 PM

**Result Notes**

Notes Recorded by Michele R. Hutchison, MD on 7/13/2013 at 4:03 PM
Lucas is our young man with the fat-soluble vitamin deficiencies. Please let mom (GM) know about the results:

The Vit D level is perfect, no change to dose.
The Vit E level is good - no change to dose.
The Vit A level was not done for some reason. However, all of his previous levels have been normal on the current dose, so I think we are OK there.
The Vit K is just a bit high, although much better than at the last check. I would like to leave the dose where it is for now, and if it is still slightly high at the next check we will decrease it a bit.

Thanks

MH

Guerre.~~~~~~~~~~Sr. [~~~~~~3] - DOB: 9/4/1999 - Flowsheet

| Component | Latest Ref Rng | 5/1/2013 | 7/5/2013 |
|---|---|---|---|
| Retinol | 0.26 - 0.70 mg/liter | 0.38 | |
| Retinyl Palmitate | 0.00 - 0.10 mg/liter | 0.04 | |
| Interpretation | | Normal | |
| Alpha Tocopherol | 5.5 - 18.0 mg/liter | 4.9 (L) | 8.9 |
| Gamma Tocopherol | 0.0 - 6.0 mg/liter | 0.6 | 0.2 |
| Vitamin K | 0.10 - 2.20 nanogram/ml | 4.63 (H) | 2.49 (H) |
| Vit D, 25-Hydroxy | 20 - 80 nanogram/ml | 32 | 45 |

**HP Officejet Pro 8500 A909n All-in-One series**

NOTE: Blocked calls are not displayed on this report.
For more information, see Junk Fax Report and the Caller ID Report.

**<u>Last Transaction</u>**

| Date | Time | Type | Station ID<br>Caller ID | Duration<br>Digital Fax | Pages | Result |
|------|------|------|-------------------------|-------------------------|-------|--------|
| Jul 29 | 4:37PM | Received | <br>9034636830 | 0:54<br>N/A | 3 | OK |

**Note:**

Image on Fax Send Report is set to On

An image of page 1 will appear here for faxes that are sent as Scan and Fax.



**Kinder Genome**

Pediatric Genetics

July 25, 2015

Dr. Malgorzata Gajda
Hilltop Pediatrics
300 N Highland Ave Suite 542
Sherman, TX 75092

RE: Lucas Guerrero   BD: 9-4-1999

Dear Dr. Gajda:

I had seen Lucas Guerrero on March 17, 2014 and felt that Lucas has a moderate form of Ehlers-Danlos syndrome (EDS) type I characterized by tall stature, hypermobility, arthralgia, and some symptoms of postural orthostatic tachycardia syndrome (POTS)—I now refer to this spectrum as articulo-autonomic dysplasia-EDS (AAD-EDS, see attachment and below). I was able to obtain whole exome sequencing (WES) that examines all 23,000 genes and I now attach results of this testing that show a mutation affecting the mitochondrial MT-CO1 gene that encodes one of many proteins that constitute a subunit of cytochrome C oxidase, also known as Complex IV. The mutation changes the amino acid threonine (T) to methionine (M) at position 31 of the MT-CO1 protein (p.T31M), and is present in 40% of Lucas' mitochondria (he thus has mixtures of mutant and normal mitochondria in his cells, something called heteroplasmy). This mutation was present in Lucas' mother at a lower level of heteroplasmy, and has not been observed in DNA databases from normal individuals—it is thus is not a common benign variation. The report classifies it as a variant of unknown significance, but I have now seen at least 6 patients with EDs-dysautonomia symptoms that have mitochondrial mutations, and the essential role of mitochondrial complex IV in energy metabolism, particularly important in the brain, heart, nerve, and muscle, leads me to suspect that such mitochondrial mutations are a cause of AAD-EDS symptoms.

It is likely that Lucas' half-brothers, at least one having early fractures that can occur with AAD-EDS, have the same mitochondrial mutation from their mother since women pass on the mitochondria to all children. We cannot predict the fraction of their mutant mitochondria compared to the 40% in Lucas. Supporting the relevance of the mitochondrial MT-CO1 mutation to AAD-EDS symptoms is the fact that the maternal grandmother has some of these symptoms, likely having the same MT-CO1 mutation and passing it on to her daughter. Relatives could have testing for the particular MT-CO1 mutation at a cost of $350 each, and this could be coordinated by Ms. Alderdice of the GeneDx company.

These results do exclude severe forms of connective tissue dysplasia such as Marfan syndrome, Ehlers-Danlos syndrome type IV, or osteogenesis imperfecta since those genes were well-covered by the exome technology. The results also excluded mutations in 56 genes such as the breast-ovarian cancer/BRCA genes, termed incidental findings because they may not be related to the indication for testing. The latter genes were screened in Lucas but not in his mother since only mutations found in his mother would be examined in her relatives.

I would emphasize that the there could be additional gene mutations contributing to AAD-EDS symptoms in Lucas and his half-brothers that were not recognized by this new WES technology. If

RE: Lucas Guerrero BD: 9-4-1999

several genes interact to cause the AAD-EDS symptoms, then the software will not recognize a change in any one of them as pathogenic. There are also many human genes that do not have known functions and/or have not been correlated with human disease—mutations in these genes may not be called as disease-related by the computer software that examines the over 600 million DNA nucleotides (AGCT letters) documented by whole exome sequencing. Finally, although most genes are covered from 90 to 97% of their length by the sequencing, some gene regions are not examined and thus mutations can be missed. Because WES is a recent advance, additional studies on patients with connective tissue laxity are certain to uncover more genes related to this disease spectrum. That is why GeneDx keeps a database of new gene discoveries, updating prior patient reports if they have such mutations. The company also offers to reanalyze the sequencing results every 3-4 years so that new gene discoveries can be incorporated into the computer software.

I would still consider Lucas to have a diagnosis of EDS-dysautonomia, now better described as AAD-EDS because my genetic data is showing that any part of the joint (articulation)—skin, nerve, muscle, bone, joint tissue, blood vessel--can be impacted to cause the same pattern of symptoms (see attachment). His clinical profile would fit with EDS type I or classic type since his hypermobility is not as dramatic as with EDS type III, although the types are being outdated by the new sequencing results. Most important is for Lucas and by implication his half-brothers to follow joint protection and nutrition strategies in the attachment. I am also attaching general information on mitochondrial diseases, with supplements that can help and medications to avoid. We do not know for sure that Lucas has significant mitochondrial dysfunction, but the supplements are harmless vitamins and can be tried without concern for side effects.

I would be happy to see the family in follow-up if they would like to discuss these results, and would urge them as before to contact me (email best) with new questions or concerns.

Sincerely yours

Golder N. Wilson MD, PhD
*Certified in Pediatrics & Medical Genetics*
Email: TheGgnome@aol.com

| Genetics & Metabolism<br>Dysmorphology, birth defects<br>Prenatal counseling | Personalized medicine, prenatal counsel<br>Development delays, mental disability<br>Growth, obesity, ADHD, behavior Issues |
|---|---|
| Medical City Hospital Suite B311<br>7777 Forest Lane<br>Dallas TX 75230<br>Phone 972-566-2500 Fax 972-566-2505 | |
| More information: www.kinderGgnome.biz | |

cc:
Ralph Martinez Attny
29000 Woodridge Ste 202
Houston TX 77087

Rigoberto, Raquel Guerrero
1212 S Hazelwood St
Sherman TX 75090

http://www.umdf.org/site/c.8qKOJ0MvF7LUG/b.7934627/k.3711/What_is_Mitochondrial_Disease.h
tmAvoidance of Toxins

## Alcohol & Cigarettes

Alcohol has been known to hasten the progression of some mitochondrial disorders. Cigarette smoke, probably due to the carbon monoxide, is known to hasten the progression of some conditions. Remember that carbon monoxide kills by inhibiting complex IV of OXPHOS, why make it worse? Cigarette smoke will make it worse.

## MSG

MSG (monosodium glutamate) has for years been known to cause migraine headaches in otherwise healthy individuals, and may trigger these events in susceptible people with mitochondrial disease. MSG is frequently added to Chinese (and other Asian) foods, and is also found in high levels of dried and canned soup. Read the label and avoid MSG if there is any sensitivity.
*Back to Top*

## Vitamins and Cofactors

Vitamins and cofactors are compounds that are required in order for the chemical reactions, which make energy, to run efficiently. By definition, a cofactor can be made by the body, whereas a vitamin cannot, and therefore must be eaten. For most people, a regular diet contains all the vitamins one could possibly need and their bodies can make as much of any specific cofactor that it needs. For those with mitochondrial disorders, added vitamins and cofactors may be useful.

The use of supplemental vitamins and cofactors is largely unproven and their use is therefore controversial in patients with mitochondrial diseases. For disorders of OXPHOS, coenzyme Q10 is considered as a generally accepted effective therapy, although it may not ultimately be effective for an individual patient. Other treatments may be effective in one disorder but not in others. Because of the varied nature of mitochondrial diseases some therapies may be helpful in many, but not in all patients and therefore cannot be considered as "proven and effective." Some treatments should only be undertaken under the specific guidance of your physician. For specific information about the controversy, as it relates to your or your child's situation, ask your physician. Most of these vitamins can be purchased from many sources, including the drugstore.

These supplemental compounds can serve two functions:
- possibly enhance enzyme function and result in improved efficiency of energy generation
- serve as antioxidants, which may slow the progression of the disease

*Back to Top*

## Vitamins and Supplements That May be Helpful**

*\*\*Consult your physician before starting any of the following possible treatments\*\**

### First Tier Supplements

| Supplement | Dose Range |
|---|---|
| CoQ10 | 5 – 15 mg/kg/day |
| Levo-carnitine (Carnitor) | Variable, starting dose of 30 mg/kg/day, typical maximum of 100 mg/kg/day |
| Riboflavin (B2) | 100 – 400 mg a day |

### Second Tier Supplement

| Supplement | Dose Range |
|---|---|
| Acetyl-L-Carnitine | 250 – 1000 mg per day |
| Thiamine (B1) | 50 – 100 mg a day |
| Niacin (B3) | 50 – 100 mg a day |
| Vitamin E | 200 – 400 IU; 1 – 3 times a day |
| Vitamin C | 100 – 500 mg; 1 – 3 times a day |
| Lipoic Acid (a -lipoate) | 60 – 200 mg; 3 times a day |
| Selenium | 25 – 50 micrograms a day |
| b -carotene | 10,000 IU; every other day to daily |
| Biotin | 2.5 – 10 mg a day |
| Folic Acid | 1 – 10 mg a day |

*Back to Top*

## Medication, Minerals, Vitamins and Substrates that May be Helpful**

*\*\*Any use of the following medications, minerals, vitamins and substrates MUST be made only under a physician's direction.\*\**

| Supplement | Dose Range |
|---|---|

| | |
|---|---|
| Calcium | Variable |
| Magnesium | Variable |
| Phosphorus | Variable |
| Succinate | 6 gm per day |
| Creatine | 5 gm bid after initial load (adults) |
| Uridine | To be determined |
| Citrates | Variable |
| Prednisone | Variable |
| Vitamin K3 | 5-30 mg per day |

*Back to Top*

## Avoidance of Physiologic Stress

Physiologic stress is triggered by external factors that may result in worsening the metabolic situation, which may result in temporary or permanent worsening of the condition. It is impossible to avoid all physiologic stressful conditions, so one should not attempt to do so. However, recognizing what may be stressful for patients allows one to adjust the lifestyle. Many patients and their parents have already identified these stresses, despite not knowing why the stresses were important, and avoid them.

**Cold Stress** is extremely important. Thermal regulation (temperature control) is not always normal in people with mitochondrial diseases and exposure to cold can result in severe heat loss and trigger an energy crisis. When going out into the cold, all exposed body parts should be covered, and exposure to extreme cold should be avoided for anything more than a short period. Over bundling can be a problem too (see below).

**Heat Stress** can be a problem in some people. This is especially true of those with an inability to sweat normally. Heat exhaustion and heat stroke may occur on hot days. It is typical for parents to describe that their child seems to "wilt" in situations like hot classrooms or direct sunlight, whereas the other children function normally. Light clothing is important. Patients should avoid direct sunlight on hot days and stay indoors if it is too warm outside. An air-conditioned environment may be needed.

**Starvation** — avoid fasting.

**Lack of sleep** may possibly be harmful.
*Back to Top*


http://www.mitoaction.org/files/MitoToxins_0.pdf
Pharmacologic Category Toxin Action Symptoms 1
. Anticonvulsants Valproate (Depakote) Sequesters carnitine; decreases fatty acid oxidation, Krebs, ETC activity and oxidative- phosphorylation; complex IV inhibition Hepatopathy
2. Psychotropic
a. Antidepressants Amitriptyline (Elavil) Causes autonomic dysfunction Amoxapine Fluoxetine (Prozac) Citalopram (Cipramil)
b. Antipsychotics Chlorpromazine (Thorazine) Fluphenazine (Prolixin) Haloperidol (Haldol) Resperidone (Risperdol)
c. Barbituates Phenobarbital Reduces mito protein synthesis; dec # and size of mitochondria Secobarbital (Seconal) Inhibits NADH dehydrogenase (complex I) Butalbital (Fiorinal) Amobarbital (Amytal) Pentobarbital (Nembutal)
d. Anxiety meds Alprazolam (Xanax) Diazepam (Valium, Diastat)
4. Cholesterol meds Statins Reduce endogenous coenzyme Q10 Myopathy Bile acids-cholestyramine Inhibits ETC Ciprofibrate Inhibits complex I



# Genetic Testing Report

| Patient Name: | GUERRERO, Lucas | GeneDx Accession No: | 1436501 |
|---|---|---|---|
| Date of Birth: | 9/4/1999 | Date Specimen Obtained: | 8/20/2014 |
| Specimen Type: | Blood in EDTA | Date Specimen Received: | 8/21/2014 |
| Submitters ID No: | None | Date Test(s) Started: | 8/28/2014 |
| Ordered By: | Dr. Golder Wilson | Date of Report: | 11/25/2014 |

*Test(s) requested:* Mitochondrial Disorders / Sequence Analysis and Deletion Testing of the Mitochondrial Genome

*Additional relatives tested:* Maternal sample (GeneDx# 1437389) was also submitted for analysis.

*Result:* **SEE INTERPRETATION**

| Gene | mtDNA | Variant | Heteroplasmy (%) | Classification |
|---|---|---|---|---|
| MT-CO1 MRNA | m.5995 C>T (C5995T) | p.Thr31Met (T31M) | Approximately 40% | Variant of unknown significance |

A definitive mitochondrial DNA mutation was not identified. Subsequent testing of this individual's mother (GeneDx# 1437389) by Sanger sequencing found that she harbors the m.5995 C>T variant of unknown significance in the MT-CO1 gene at a level of heteroplasmy that appears to be lower than that found in her child.

This individual's haplogroup and a table of observed polymorphisms are also provided.* The observed polymorphisms have not been reported to be associated with a disorder of mitochondrial metabolism when present in association with this individual's specific haplogroup.

*Interpretation:* A variant of unknown significance has been identified in the MT-CO1 gene. The m.5995 C>T variant has not been reported in Mitomap (www.mitomap.org) as a mutation or a benign polymorphism, and it has not been reported in the general population [0 of 2704 individuals in mtDB www.genpat.uu.se/mtDB); 0 of 3735 individuals in MitoWheel (http://mitowheel.org/mitowheel.html); 0 of 6391 individuals in GeneDx mtDNA variant database]. The p.T31M variant is a non-conservative amino acid substitution, which is likely to impact secondary protein structure as these residues differ in polarity and size. This substitution occurs at a position where amino acids with similar properties as Threonine are conserved across species. In silico analysis is inconsistent in its predictions as to whether or not the variant is damaging to the protein structure/function. Therefore, based on the currently available information it is unclear whether this variant is a disease-causing mutation or a rare benign variant.

If this individual's mother does not have symptoms of a mitochondrial disorder or has less severe symptoms than that of her child, the presence of the m.5995 C>T variant at an apparently lower level of heteroplasmy than her child supports this variant being a pathogenic mutation. If the mother has similar symptoms as her child, no further interpretation is possible.

*Recommendation:* Clinical correlation and genetic counseling is recommended.



# *Genetic Testing Report*

| | | | |
|---|---|---|---|
| Patient Name: | GUERRERO, Lucas | GeneDx Accession No: | 1436501 |
| Date of Birth: | 9/4/1999 | Date Specimen Obtained: | 8/20/2014 |
| Specimen Type: | Blood in EDTA | Date Specimen Received: | 8/21/2014 |
| Submitters ID No: | None | Date Test(s) Started: | 8/28/2014 |
| Ordered By: | Dr. Golder Wilson | Date of Report: | 11/25/2014 |

*Methods:*  The entire mitochondrial genome from the submitted sample was amplified and sequenced using a solid state sequencing by-synthesis process. DNA sequence was assembled and analyzed in comparison with the revised Cambridge Reference Sequence (rCRS) and the reported mutations and polymorphisms listed in the MITOMAP database (http://www.mitomap.org). The presence of a disease associated sequence variant, if present, is confirmed by conventional dideoxy sequence analysis or other methods. A reference library of more than 6000 samples from different ethnic groups and online databases for mtDNA variations is used to evaluate variants of unknown clinical significance. In some cases, additional testing may be recommended to elucidate pathogenicity. For mtDNA deletions, levels of heteroplasmy of 15% or lower may not be detected and for mtDNA point mutations, novel mutations with a heteroplasmy of lower than 5% may not be detected by Next-Generation sequencing.

Reportable variants of potential pathogenicity were evaluated in the maternal sample by PCR-amplification of the relevant portion(s) of the mitochondrial genome from genomic DNA. Bidirectional sequence was obtained and DNA sequence was analyzed and compared to the published gene sequence. The methods used by GeneDx are expected to be greater than 99% sensitive in detecting mutations identifiable by sequencing. Levels of mutant heteroplasmy 25% or lower may not be detected, and levels of mutant heteroplasmy 75% or higher may appear to be homoplasmic by Sanger sequencing.

Report electronically signed by:

Renkui Bai M.D., Ph.D., FACMG

Director, Genetic Testing for Mitochondrial Disorders

Report electronically signed by:

Eden Haverfield Ph.D., FACMG

Director, Whole Exome Sequencing Program

mtDNA RefSeq: NC_012920.1

This assay was developed and its performance determined by GeneDx for the purpose of identifying quality defects (including point mutations, small insertions/deletions, as well as large single deletions) in mtDNA. For mtDNA deletions, this test will detect almost all disease-associated heteroplasmy reported to date (Boulet et al., 1992 Am J Hum Genet 51:1187-1200; Sciacco et al., 1994 Hum Mol Genet 3:13-19); levels of heteroplasmy of 15% or lower may not be detected and the standard deviation for heteroplasmy of large deletions is estimated to be 5%. For mtDNA point mutations, novel mutations with a heteroplasmy of lower than 5% may not be detected. Normal findings do not rule out the diagnosis of a mitochondrial disorder. The clinical implications of some variations may be unknown at the time of this report. This test is used for clinical purposes. It has not been cleared or approved by the FDA. The FDA has determined that such clearance or approval is not necessary. Pursuant to the requirements of CLIA '88, this laboratory has established and verified the test's accuracy and precision. CLIA ID#: 21D0969951. MD License: 953.



# Genetic Testing Report

**Patient Name: GUERRERO, Lucas**
**Submitters ID No: None Provided**

**GeneDx Accession No: 1436501**
**Date of Report: 09/18/2014**

*MtDNA Polymorphisms

| Nucleotide Position | Functional Location | Nucleotide Change | Codon Change | Amino Acid Change | Frequency (Gen. Pop) |
|---|---|---|---|---|---|
| 146 | MT-DLOOP | T>C | | | 899/5453 |
| 263 | MT-DLOOP | A>G | | | 5371/5453 |
| 315 | MT-DLOOP | 315dupC | | | common |
| 8860 | MT-ATP6 mRNA | A>G | ACA>GCA | T112A | 6370/6391 |
| 15326 | MT-CYB mRNA | A>G | ACA>GCA | T194A | 6312/6391 |
| 16291 | MT-DLOOP | C>T | | | 118/5453 |

Haplogroup (HG): H2a2b

GeneDx   -   207 Perry Parkway   -   Gaithersburg, MD 20877   -   Tel (301) 519-2100   -   Fax (301) 519-2892   -   www.genedx.com



# *Genetic Testing Report*

| | | | |
|---|---|---|---|
| **Patient Name:** | **GUERRERO, Lucas** | **GeneDx Accession No:** | **1436501** |
| **Date of Birth:** | **9/4/1999** | **Date Specimen Obtained:** | **8/20/2014** |
| **Specimen Type:** | **Blood in EDTA** | **Date Specimen Received:** | **8/21/2014** |
| **Submitters ID No:** | **None** | **Date Test(s) Started:** | **8/28/2014** |
| **Ordered By:** | **Dr. Golder Wilson** | **Date of Report:** | **11/25/2014** |

*Test(s) Requested:*   Diagnostic Testing / XomeDxPlus / Whole Exome Sequence Analysis

*Clinical Indication:*   Male with a history of tall stature, joint laxity, and irritable bowel syndrome. The family history is significant for fractures. A differential diagnosis of Ehlers-Danlos syndrome was given.

A sample from this individual's mother (GeneDx# 1437389) was also submitted for variant segregation analysis by whole exome sequencing.

*Interpretation:*

**1. Causative Mutations in Disease Genes Associated with Reported Phenotype:**
**None identified.**

**2. Variants in Disease Genes Possibly Associated with Reported Phenotype:**
**None identified.**

**ACMG Incidental Findings:**
**None identified**

**The results of the mitochondrial genome sequencing and deletion analysis are provided in the attached report.**

Whole exome sequencing did not identify any definitive mutations or variants that relate to this patient's reported phenotype.

A medical provider can request an annual reanalysis of the exome data generated with the XomeDx test. The current data can be reassessed for the presence of any variants that may be newly linked to this individual's phenotype since the date of this report.

*Additional Analysis Comments:*   Analysis of XomeDx for the proband includes evaluation of variants that are identified to be de novo (when both parents submitted), compound heterozygous (when both parents submitted), homozygous, heterozygous and X-linked recessive in addition to relevant analysis based on the family structure and reported phenotype. In view of the phenotype information provided, analysis in this case specifically included review of variants in genes associated with tall stature, connective tissue abnormality, muscle weakness, hypotonia, joint hypermobility, joint laxity, recurrent fractures, scoliosis, orthostatic tachycardia, dysautonomia, delayed gross motor development, arthralgia, pectus excavatum, gastroparesis, gastrointestinal reflux, ureter abnormality, hyperextensible skin, soft skin, neonatal jaundice, vision abnormality, constipation, fatigue, hypotension, neonatal hypoglycemia, vitamin D deficiency, vitamin K deficiency, feeding difficulties, and premature birth.

The following genes associated with Ehlers-Danlos syndrome were specifically reviewed, with the percentage of the coding region covered at >10X indicated in parentheses: COL1A1 (98.7%), COL1A2 (99.9%), COL3A1 (95.5%), COL5A1 (98.0%), COL5A2 (99.1%). No pathogenic sequence changes were identified in the coding regions of these genes covered by the XomeDx test.



# Genetic Testing Report

| | | | |
|---|---|---|---|
| Patient Name: | GUERRERO, Lucas | GeneDx Accession No: | 1436501 |
| Date of Birth: | 9/4/1999 | Date Specimen Obtained: | 8/20/2014 |
| Specimen Type: | Blood in EDTA | Date Specimen Received: | 8/21/2014 |
| Submitters ID No: | None | Date Test(s) Started: | 8/28/2014 |
| Ordered By: | Dr. Golder Wilson | Date of Report: | 11/25/2014 |

*ACMG Incidental Findings:*

No reportable incidental findings were identified in coding regions covered by the XomeDx test for 56 genes recommended to be reported by the ACMG (Green et al., 2013). See Appendix 1 for the list of 56 genes.

**Limitations Regarding Incidental Findings:**

Known or expected pathogenic variants in the 56 genes recommended by the ACMG are reported for the proband (see Appendix 1 for this list of genes (Green et al., 2013)). The presence or absence of the proband's identified incidental findings is available only for relatives who underwent whole exome sequencing as part of the proband's test. Variants that may be present in a relative, but are not present in the proband, would not be detected and therefore are not reported. Known or expected pathogenic variants may be present in a portion of the gene not covered by this test and therefore would not be detected. The absence of reportable incidental findings for any particular gene does not mean there are no known or expected pathogenic variants in that gene, or other variants that may confer susceptibility to the disorders listed.

*Recommendation:*

It is possible that this patient has a pathogenic mutation outside of the coding regions analyzed, or in a regulatory or deep intronic region that would not be detected by whole exome sequencing. Additional genetic testing, which may be able to determine the presence of any other pathogenic mutations, could be considered. Genetic counseling is recommended to discuss the implications of this report.

*Methods:*

Using genomic DNA from the submitted specimen(s), the Agilent SureSelect XT2 All Exon V4 kit was used to target the exon regions of the genome(s). These targeted regions were sequenced using the Illumina HiSeq 2000 sequencing system with 100bp paired-end reads. The DNA sequence was mapped to and analyzed in comparison with the published human genome build UCSC hg19 reference sequence. The targeted coding exons and splice junctions of the known protein-coding RefSeq genes were assessed for the average depth of coverage and data quality threshold values*. The XomeAnalyzer was used to evaluate sequence changes in this individual compared to other sequenced family members. All reported sequence variants in the proband and relative samples (if submitted for variant segregation analysis by whole exome sequencing) were confirmed by conventional di-deoxy DNA sequence analysis or other appropriate method.

*\*Quality Metrics*

| Mean Depth of Coverage[1] | 107x |
|---|---|
| Quality threshold[2] | 98.3% |

The above values represent metrics from this XomeDx evaluation. [1]Mean depth of coverage refers to the sequence mean read depth across the XomeDx targeted region, defined as coding exons and splice junctions of Agilent SureSelect XT2 All Exon V4 kit targeted protein coding RefSeq genes. [2]The quality threshold refers to the percentage of the XomeDx defined target region where read depth was at least 10x coverage to permit high quality exome variant base calling, annotation and evaluation. Average quality thresholds may range from >90-95% of the XomeDx targeted region, indicating a small portion of the target region may not be covered with sufficient depth or quality to confidently call variant positions.



# Genetic Testing Report

| | | | |
|---|---|---|---|
| Patient Name: | GUERRERO, Lucas | GeneDx Accession No: | 1436501 |
| Date of Birth: | 9/4/1999 | Date Specimen Obtained: | 8/20/2014 |
| Specimen Type: | Blood in EDTA | Date Specimen Received: | 8/21/2014 |
| Submitters ID No: | None | Date Test(s) Started: | 8/28/2014 |
| Ordered By: | Dr. Golder Wilson | Date of Report: | 11/25/2014 |

*Limitations:*   Absence of a definitive disease causing mutation identified with the XomeDx test does not exclude the possibility of a genetic basis for the genetic disorder in the proband. Some types of genetic abnormalities may not be detectable with the technologies performed with the XomeDx test. It is possible that the genomic region where a disease causing mutation exists in the proband was not captured using the current technologies and therefore was not detected. Additionally, it is possible that a particular genetic abnormality may not be recognized as the underlying cause of the genetic disorder due to incomplete scientific knowledge about the function of all genes in the human genome. Only variations in genes associated with the medical condition, or thought to potentially be clinically relevant to the proband's medical condition are reported here. The clinical implications of some variations may not be known at the time of this report.

Report electronically signed by:

Kristin Monaghan Ph.D., FACMG

Assistant Director, Whole Exome Sequencing Program

Report electronically signed by:

Eden Haverfield Ph.D., FACMG

Director, Whole Exome Sequencing Program

References: Green et al. (2013) Genet Med 15:565-574

This assay was developed and its performance determined by GeneDx for the sole purpose of identifying small sequence variants in the target regions tested. This test may not detect large chromosomal aberrations, such as larger deletions and duplications (larger than 20bp) or rearrangements. Normal findings do not rule out the diagnosis of any disorder since some genetic abnormalities may be undetectable with this assay. The Agilent SureSelect XT2v4 kit does not target all coding exons of all known RefSeq genes; the genomic coordinates of the regions not covered are available on request. This test should be used for clinical purposes. It has not been cleared or approved by the FDA. The FDA has determined that such clearance or approval is not necessary. Pursuant to the requirements of CLIA '88, this laboratory has established and verified the test's accuracy and precision. CLIA ID#: 21D0969951. MD License: 953.

GeneDx   -   207 Perry Parkway   -   Gaithersburg, MD 20877   -   Tel (301) 519-2100   -   Fax (301) 519-2892   -   www.genedx.com

## Appendix 1. 56 Genes Reviewed for Incidental Findings (Green et al., 2013):

| Gene | Disease | Mode of Inheritance | MIM-Gene |
|---|---|---|---|
| ACTA2 | Marfan Syndrome; Loeys-Dietz Syndromes; TAAD | Autosomal Dominant | 102620 |
| ACTC1 | Hypertrophic cardiomyopathy; Dilated cardiomyopathy | Autosomal Dominant | 102540 |
| APC | Familial adenomatous polyposis | Autosomal Dominant | 611731 |
| APOB | Familial hypercholesterolemia | Autosomal Dominant | 107730 |
| BRCA1 | Hereditary Breast and Ovarian Cancer | Autosomal Dominant | 113705 |
| BRCA2 | Hereditary Breast and Ovarian Cancer | Autosomal Dominant | 600185 |
| CACNA1S | Malignant hyperthermia susceptibility | Autosomal Dominant | 114208 |
| COL3A1 | Ehlers-Danlos syndrome – vascular type | Autosomal Dominant | 120180 |
| DSC2 | Arrhythmogenic right ventricular cardiomyopathy | Autosomal Dominant | 125645 |
| DSG2 | Arrhythmogenic right ventricular cardiomyopathy | Autosomal Dominant | 125671 |
| DSP | Arrhythmogenic right ventricular cardiomyopathy | Autosomal Dominant | 125647 |
| FBN1 | Marfan Syndrome; Loeys-Dietz Syndromes; TAAD | Autosomal Dominant | 134797 |
| GLA | Hypertrophic cardiomyopathy; Dilated cardiomyopathy | X-linked | 300644 |
| KCNH2 | Long QT syndrome; Brugada syndrome | Autosomal Dominant | 152427 |
| KCNQ1 | Long QT syndrome; Brugada syndrome | Autosomal Dominant | 607542 |
| LDLR | Familial hypercholesterolemia | Autosomal Dominant | 606945 |
| LMNA | Hypertrophic cardiomyopathy; Dilated cardiomyopathy | Autosomal Dominant | 150330 |
| MEN1 | Multiple Endocrine Neoplasia Type 1 | Autosomal Dominant | 613733 |
| MLH1 | Lynch Syndrome | Autosomal Dominant | 120436 |
| MSH2 | Lynch Syndrome | Autosomal Dominant | 609309 |
| MSH6 | Lynch Syndrome | Autosomal Dominant | 600678 |
| MUTYH | MYH-Associated Polyposis | Autosomal Recessive | 604933 |
| MYBPC3 | Hypertrophic cardiomyopathy; Dilated cardiomyopathy | Autosomal Dominant | 600958 |
| MYL2 | Hypertrophic cardiomyopathy; Dilated cardiomyopathy | Autosomal Dominant | 160781 |
| MYL3 | Hypertrophic cardiomyopathy; Dilated cardiomyopathy | Autosomal Dominant | 160790 |
| MYLK | Marfan Syndrome; Loeys-Dietz Syndromes; TAAD | Autosomal Dominant | 600922 |
| MYH7 | Hypertrophic cardiomyopathy; Dilated cardiomyopathy | Autosomal Dominant | 160760 |
| MYH11 | Marfan Syndrome; Loeys-Dietz Syndromes; TAAD | Autosomal Dominant | 160745 |
| NF2 | Neurofibromatosis type 2 | Autosomal Dominant | 607379 |
| PCSK9 | Familial hypercholesterolemia | Autosomal Dominant | 607786 |
| PKP2 | Arrhythmogenic right ventricular cardiomyopathy | Autosomal Dominant | 602861 |
| PMS2 | Lynch Syndrome | Autosomal Dominant | 600259 |
| PRKAG2 | Hypertrophic cardiomyopathy; Dilated cardiomyopathy | Autosomal Dominant | 602743 |
| PTEN | PTEN Hamartoma Tumor Syndrome | Autosomal Dominant | 601728 |
| RB1 | Retinoblastoma | Autosomal Dominant | 614041 |
| RET | Multiple Endocrine Neoplasia type 2; Familial Medullary Thyroid Cancer | Autosomal Dominant | 164761 |
| RYR1 | Malignant hyperthermia susceptibility | Autosomal Dominant | 180901 |
| RYR2 | Catecholaminergic polymorphic ventricular tachycardia | Autosomal Dominant | 180902 |
| SCN5A | Long QT syndrome; Brugada syndrome | Autosomal Dominant | 600163 |
| SDHAF2 | Hereditary Paraganglioma-Pheochromocytoma Syndrome | Autosomal Dominant | 613019 |
| SDHB | Hereditary Paraganglioma-Pheochromocytoma Sydnrome | Autosomal Dominant | 185470 |
| SDHC | Hereditary Paraganglioma-Pheochromocytoma Sydnrome | Autosomal Dominant | 602413 |
| SDHD | Hereditary Paraganglioma-Pheochromocytoma Sydnrome | Autosomal Dominant | 602690 |
| SMAD3 | Marfan Syndrome; Loeys-Dietz Syndromes; TAAD | Autosomal Dominant | 603109 |
| STK11 | Peutz-Jeghers syndrome | Autosomal Dominant | 602216 |
| TGFBR1 | Marfan Syndrome; Loeys-Dietz Syndromes; TAAD | Autosomal Dominant | 190181 |
| TGFBR2 | Marfan Syndrome; Loeys-Dietz Syndromes; TAAD | Autosomal Dominant | 190182 |
| TMEM43 | Arrhythmogenic right ventricular cardiomyopathy | Autosomal Dominant | 612048 |
| TNNI3 | Hypertrophic cardiomyopathy; Dilated cardiomyopathy | Autosomal Dominant | 191044 |
| TNNT2 | Hypertrophic cardiomyopathy; Dilated cardiomyopathy | Autosomal Dominant | 191045 |
| TP53 | Li-Fraumeni Syndrome | Autosomal Dominant | 191170 |
| TPM1 | Hypertrophic cardiomyopathy; Dilated cardiomyopathy | Autosomal Dominant | 191010 |
| TSC1 | Tuberous Sclerosis Complex | Autosomal Dominant | 605284 |
| TSC2 | Tuberous Sclerosis Complex | Autosomal Dominant | 191092 |
| VHL | Von Hippel Lindau syndrome | Autosomal Dominant | 608537 |
| WT1 | WT1-related Wilms tumor | Autosomal Dominant | 607102 |

# VITAMIN "D" DEFICIENCY

# AND

# EHLERS-DANLOS SYNDROME

Medscape Reference
Reference

- News
- Reference
- Education
- MEDLINE

**Medscape** Drugs, Diseases
**REFERENCE** & Procedures

# Vitamin D Deficiency and Related Disorders

- Author: Vin Tangpricha, MD, PhD; Chief Editor: George T Griffing, MD   more...

Updated: Dec 10, 2012

## Background

Vitamin D deficiency in children can manifest as rickets (it is the most common cause of nutritional rickets), which presents as bowing of the legs. Vitamin D deficiency in adults results in osteomalacia, which presents as a poorly mineralized skeletal matrix. These adults can experience chronic muscle aches and pains (see the images below).[1] (See Presentation and Prognosis.)



Findings in patients with rickets.



Radiograph in a 4-year-old girl with rickets depicts bowing of the legs caused by loading.



Anteroposterior and lateral radiographs of the wrist of an 8-year-old boy with rickets demonstrates cupping and fraying of the metaphyseal region.

Vitamin D is important for calcium homeostasis and for optimal skeletal health. The major function of vitamin D is to increase the efficiency of calcium absorption from the small intestine. Heaney and colleagues demonstrated that maximum calcium absorption occurs at levels of 25-hydroxyvitamin D (25[OH]D) greater than 32 ng/mL. (See Pathophysiology and Etiology.)[2]

Vitamin D also enhances the absorption of phosphorus from the distal small bowel. Adequate calcium and phosphorus absorption from the intestine is important for proper mineralization of the bone. The second major function of vitamin D is involvement in the maturation of osteoclasts, which resorb calcium

from the bones. (See Pathophysiology and Etiology.)

The term vitamin D refers to either vitamin D2 or vitamin D3. Vitamin D3, also known as cholecalciferol, is either made in the skin or obtained in the diet from fatty fish. Vitamin D2, also known as ergocalciferol, is obtained from irradiated fungi, such as yeast. Vitamin D2 and vitamin D3 are used to supplement food products or are contained in multivitamins. (See Treatment and Medication.)

Past studies suggested that vitamin D3 may be more effective than vitamin D2 in establishing normal vitamin D stores.[3, 4] However, a study by Holick and colleagues demonstrated that vitamin D2 and vitamin D3 appear to be equipotent in raising 25(OH)D concentrations when they are given in daily doses of 1000 IU.[5]

## Physiology

The production of vitamin D3 in the skin involves a series of reactions initiating with 7-dehydrocholesterol. Upon exposure to ultraviolet B (UVB) radiation between the wavelengths of 290-315 nm, 7-dehydrocholesterol is converted to previtamin D3, which is then converted to vitamin D3 after a thermally induced isomerization reaction in the skin. From the skin, newly formed vitamin D3 enters the circulation by binding to vitamin D binding protein (DBP). In order to become active, vitamin D requires 2 sequential hydroxylations to form 1,25-dihydroxyvitamin D (1,25[OH]$_2$D).

Vitamin D is initially hydroxylated in the 25 position by the hepatic microsomal and/or mitochondrial enzyme vitamin D 25-hydroxylase. The second hydroxylation occurs in the kidney and is performed by the P450 enzyme 25-hydroxyvitamin D-1 alpha-hydroxylase.

Upon entering the cell, the 1,25(OH)$_2$D hormone binds to the vitamin D receptor (VDR). The bound vitamin D receptor then forms a heterodimer with the retinoic acid X receptor (RXR). This heterodimer then goes to the nucleus to bind deoxyribonucleic acid (DNA) and increases transcription of vitamin D–related genes.

## Pathophysiology

Inadequate circulating 25(OH)D is associated with elevated parathyroid hormone (PTH); this condition is called secondary hyperparathyroidism. The rise in PTH may result in increased mobilization of calcium from the bone, which leads to decreased mineralization of the bone.

Of note, prolonged exposure to the sun does not cause vitamin D toxicity. This is because after prolonged UVB radiation exposure, the vitamin D made in the skin is further degraded to the inactive vitamin D metabolites tachysterol and lumisterol.

## Etiology

Vitamin D deficiency can result from the following:

- Inadequate exposure to sunlight - This causes a deficiency in cutaneously synthesized vitamin D; adults in nursing homes or health care institutions are at a particularly high risk[6]
- Vitamin D malabsorption problems - People who have undergone resection of the small intestine are at risk for this condition; diseases associated with vitamin D malabsorption include celiac sprue, short bowel syndrome,[7] and cystic fibrosis[8]
- Minimal amounts of vitamin D in human breast milk - The American Academy of Pediatrics recommends vitamin D supplementation starting at age 2 months for infants fed exclusively with breast milk[9]
- Medications - Some medications are associated with vitamin D deficiency; drugs such as Dilantin, phenobarbital, and rifampin can induce hepatic p450 enzymes to accelerate the catabolism of vitamin D

## Epidemiology

### Mortality/Morbidity

#### Occurrence in the United States

Vitamin D insufficiency is highest among people who are elderly, institutionalized, or hospitalized. In the United States, 60% of nursing home residents[10] and 57% of hospitalized patients[11] were found to be vitamin D deficient.

However, vitamin D insufficiency is not restricted to the elderly and hospitalized population; several studies have found a high prevalence of vitamin D deficiency among healthy, young adults. A study determined that nearly two thirds of healthy, young adults in Boston were vitamin D insufficient at the end of winter.[12]

Vitamin D status may fluctuate throughout the year, with the highest serum 25(OH)D level occurring after the summer and the lowest serum 25(OH)D concentrations after winter. A study by Shoben at el demonstrated that mean serum 25(OH)D concentrations can vary as much as 9.5 ng/mL. Factors such

as male sex, higher latitude, and greater physical activity levels were found to be associated with greater differences in serum 25(OH)D concentrations in winter and summer.[13]

### International occurrence

Similar rates of vitamin D deficiency have been reported in Europe[14] and Canada. A greater prevalence of vitamin D deficiency exists in Middle Eastern countries. A study of 316 young adults aged 30-50 years from the Middle East showed that 72.8% had 25(OH)D values of less than 15 ng/dL (that is, severely deficient). This was significantly more common in women than in men (83.9% vs 48.5%, respectively). The difference between sexes probably reflects the cultural and religious practices leading to less skin exposure in women than in men.[15, 16, 17, 18]

### Race-related demographics

Darker skin interferes with the cutaneous synthesis of vitamin D. A study by Holick and coauthors demonstrated that non-Hispanic black subjects require 6 times the amount of UV radiation necessary to produce a serum vitamin D concentration similar to that found in non-Hispanic white subjects.[19] The explanation for the increased radiation necessary to increase vitamin D levels is that melanin absorbs ultraviolet radiation.

The decreased efficacy of vitamin D production by darker-pigmented skin explains the higher prevalence of vitamin D insufficiency among darker-skinned adults. Dawson-Hughes and colleagues demonstrated that in Boston, 73% of elderly black subjects were vitamin D insufficient, compared with 35% of elderly non-Hispanic whites.[20]

In a large survey of 1500 healthy black women younger than 50 years, 40% were vitamin D deficient (25[OH]D < 16ng/mL), compared with 4% of 1400 white women in that study.[21]

### Age-related demographics

Vitamin D production in the skin declines with advancing age, making elderly populations more dependent on dietary vitamin D. For the average older person, higher dietary intake of vitamin D may be required to achieve optimal serum levels of 25(OH)D.[22]

# Prognosis

The treatment of vitamin D insufficiency can decrease the risk of hip and nonvertebral fractures.[23, 24] A meta-analysis by Boonen et al of postmenopausal women and of men aged 50 years or older reporting a risk of hip fracture found that oral vitamin D supplementation reduced the risk of hip fractures by 18% when vitamin D and calcium were taken together.[25] Most of the trials that demonstrated the antifracture efficacy of vitamin D used approximately 800 IU of vitamin D3. The minimum 25(OH)D level at which antifracture efficacy was observed was 30 ng/ml (74 nmol/L), suggesting a threshold for optimal levels of 25(OH)D for fracture protection.

Results from another meta-analysis, evaluating the efficacy of oral vitamin D supplementation in the prevention of hip and other nonvertebral bone fractures in individuals aged 65 years or older, indicated that vitamin D offers dose-dependent fracture protection.[26] The analysis, by Bischoff-Ferrari et al, took into account 12 double-blind, randomized, controlled trials (RCTs) for nonvertebral fractures (n = 42,279) and 8 RCTs for hip fractures (n = 40,886), comparing the results obtained from the use of oral vitamin D (with or without calcium) with those derived from the administration of calcium alone and from placebo use.

In this study, doses of more than 400 IU/day were found to reduce fractures by at least 20% in individuals aged 65 years or older. In contrast to the Boonen study, the investigators maintained that these effects were independent of calcium supplementation.

Vitamin D insufficiency contributes to osteoporosis by decreasing intestinal calcium absorption.[2, 27] Treatment of vitamin D deficiency has been shown to improve bone mineral density.[28, 29] An analysis of the Third National Health and Nutrition Examination Survey (NHANES III) demonstrated a positive correlation between circulating 25(OH)D levels and bone mineral density.[30]

Vitamin D supplementation has been associated with a reduction in falls and improved muscle strength in the elderly. A meta-analysis demonstrated that vitamin D supplementation resulted in a reduction in falls of about 22% in ambulatory and institutionalized elderly subjects, as compared with controls.[31, 32] Another meta-analysis examining muscle strength associated with vitamin D supplementation found significant improvement in reduced postural sway, timed up-and-go test results, and lower extremity strength in a pooled analysis of 13 studies.[33]

Epidemiologic data suggest that vitamin D deficiency places adults at risk for developing cancer[34, 35, 36, 37, 38]; these apparently include breast, colon, and prostate cancer.[39, 40] Several studies using cultured cancer cells in mice models have also supported the notion that vitamin D prevents the growth of cancers.[41] Larger, randomized clinical trials are underway in humans to establish the role of vitamin D in the prevention of cancers.

Vitamin D insufficiency may increase the risk for type I and type II diabetes mellitus.[42, 22] In NHANES III, lower vitamin D status was associated with higher fasting glucose and 2-hour glucose after an oral glucose tolerance test.[43] Furthermore, vitamin D supplementation in adults has been associated with improved insulin sensitivity in several small, case-control studies.[42]

Joergensen et al determined that vitamin D deficiency in type 1 diabetes may predict all causes of mortality but not development of microvascular complications.[44] The contribution of vitamin D deficiency to mortality must be mediated by nonvascular mechanisms.

A meta-analysis evaluated the effect of vitamin D supplementation (using a mean supplementation dosage of about 500 IU daily) on all-cause mortality in 18 randomized controlled trials and found a 7% relative risk reduction for death.[45] Severe vitamin D deficiency (25(OH)D < 10 ng/mL) has been associated with increased in-hospital mortality in patients admitted for acute coronary syndrome.[46]

A Cochrane Review of 50 randomized, controlled trials that included more than 94,000 individuals, primarily elderly women, found that vitamin D3 supplementation decreased mortality. Other forms of vitamin D, including vitamin D2, calcitriol, and alpha-calcidiol, did not reduce mortality.[47]

## Contributor Information and Disclosures

Author
**Vin Tangpricha, MD, PhD** Associate Professor of Medicine, Division of Endocrinology, Metabolism and Lipids, Emory University School of Medicine

Vin Tangpricha, MD, PhD is a member of the following medical societies: American College of Clinical Endocrinologists and Endocrine Society

Disclosure: NIH Grant/research funds Principal Investigator; Novadiol Consulting fee Consulting; Cystic Fibrosis Grant/research funds Other

Coauthor(s)
**Natasha B Khazai, MD** Instructor of Medicine, Division of Endocrinology, Emory University School of Medicine

Natasha B Khazai, MD is a member of the following medical societies: American Association of Clinical Endocrinologists and Endocrine Society

Disclosure: Nothing to disclose.

Chief Editor
**George T Griffing, MD** Professor of Medicine, St Louis University School of Medicine

George T Griffing, MD is a member of the following medical societies: American Association for the Advancement of Science, American College of Medical Practice Executives, American College of Physician Executives, American College of Physicians, American Diabetes Association, American Federation for Medical Research, American Heart Association, Central Society for Clinical Research, Endocrine Society, International Society for Clinical Densitometry, and Southern Society for Clinical Investigation

Disclosure: Nothing to disclose.

Additional Contributors
**Romesh Khardori, MD, PhD, FACP** Professor of Endocrinology, Director of Training Program, Division of Endocrinology, Diabetes and Metabolism, Strelitz Diabetes and Endocrine Disorders Institute, Department of Internal Medicine, Eastern Virginia Medical School

Romesh Khardori, MD, PhD, FACP is a member of the following medical societies: American Association of Clinical Endocrinologists, American College of Physicians, American Diabetes Association, and Endocrine Society

Disclosure: Nothing to disclose.

**Francisco Talavera, PharmD, PhD** Adjunct Assistant Professor, University of Nebraska

Medical Center College of Pharmacy; Editor-in-Chief, Medscape Drug Reference

Disclosure: Medscape Salary Employment

## References

1. Holick MF. Vitamin D deficiency: what a pain it is. *Mayo Clin Proc*. Dec 2003;78(12):1457-9. [Medline].

2. Heaney RP, Dowell MS, Hale CA, et al. Calcium absorption varies within the reference range for

serum 25-hydroxyvitamin D. *J Am Coll Nutr.* Apr 2003;22(2):142-6. [Medline]. [Full Text].

3. Armas LA, Hollis BW, Heaney RP. Vitamin D2 is much less effective than vitamin D3 in humans. *J Clin Endocrinol Metab.* Nov 2004;89(11):5387-91. [Medline]. [Full Text].

4. Trang HM, Cole DE, Rubin LA, et al. Evidence that vitamin D3 increases serum 25-hydroxyvitamin D more efficiently than does vitamin D2. *Am J Clin Nutr.* Oct 1998;68(4):854-8. [Medline]. [Full Text].

5. Holick MF, Biancuzzo RM, Chen TC, et al. Vitamin D2 is as effective as vitamin D3 in maintaining circulating concentrations of 25-hydroxyvitamin D. *J Clin Endocrinol Metab.* Mar 2008;93(3):677-81. [Medline].

6. Liu BA, Gordon M, Labranche JM, et al. Seasonal prevalence of vitamin D deficiency in institutionalized older adults. *J Am Geriatr Soc.* May 1997;45(5):598-603. [Medline].

7. Tangpricha V, Luo M, Fernández-Estívariz C, et al. Growth hormone favorably affects bone turnover and bone mineral density in patients with short bowel syndrome undergoing intestinal rehabilitation. *J Parenter Enteral Nutr.* Nov-Dec 2006;30:480-6. [Medline].

8. Koutkia P, Lu Z, Chen TC, Holick MF. Treatment of vitamin D deficiency due to Crohn's disease with tanning bed ultraviolet B radiation. *Gastroenterology.* Dec 2001;121(6):1485-8. [Medline].

9. Gartner LM, Greer FR. Prevention of rickets and vitamin D deficiency: new guidelines for vitamin D intake. *Pediatrics.* Apr 2003;111(4 Pt 1):908-10. [Medline]. [Full Text].

10. Elliott ME, Binkley NC, Carnes M, et al. Fracture risks for women in long-term care: high prevalence of calcaneal osteoporosis and hypovitaminosis D. *Pharmacotherapy.* Jun 2003;23(6):702-10. [Medline].

11. Thomas MK, Lloyd-Jones DM, Thadhani RI, et al. Hypovitaminosis D in medical inpatients. *N Engl J Med.* Mar 19 1998;338(12):777-83. [Medline]. [Full Text].

12. Tangpricha V, Pearce EN, Chen TC, et al. Vitamin D insufficiency among free-living healthy young adults. *Am J Med.* Jun 1 2002;112(8):659-62. [Medline].

13. Shoben AB, Kestenbaum B, Levin G, Hoofnagle AN, Psaty BM, Siscovick DS, et al. Seasonal variation in 25-hydroxyvitamin d concentrations in the cardiovascular health study. *Am J Epidemiol.* Dec 15 2011;174(12):1363-72. [Medline].

14. van der Wielen RP, Löwik MR, van den Berg H, et al. Serum vitamin D concentrations among elderly people in Europe. *Lancet.* Jul 22 1995;346(8969):207-10. [Medline].

15. Gannagé-Yared MH, Chemali R, Yaacoub N, et al. Hypovitaminosis D in a sunny country: relation to lifestyle and bone markers. *J Bone Miner Res.* Sep 2000;15(9):1856-62. [Medline].

16. Looker AC, Gunter EW. Hypovitaminosis D in medical inpatients. *N Engl J Med.* Jul 30 1998;339(5):344-5; author reply 345-6. [Medline].

17. Fuleihan GE, Deeb M. Hypovitaminosis D in a sunny country. *N Engl J Med.* Jun 10 1999;340(23):1840-1. [Medline].

18. Mishal AA. Effects of different dress styles on vitamin D levels in healthy young Jordanian women. *Osteoporos Int.* 2001;12(11):931-5. [Medline].

19. Clemens TL, Adams JS, Henderson SL, et al. Increased skin pigment reduces the capacity of skin to synthesise vitamin D3. *Lancet.* Jan 9 1982;1(8263):74-6. [Medline].

20. Harris SS, Soteriades E, Coolidge JA, et al. Vitamin D insufficiency and hyperparathyroidism in a low income, multiracial, elderly population. *J Clin Endocrinol Metab.* Nov 2000;85(11):4125-30. [Medline]. [Full Text].

21. Nesby-O'Dell S, Scanlon KS, Cogswell ME, et al. Hypovitaminosis D prevalence and determinants among African American and white women of reproductive age: third National Health and Nutrition Examination Survey, 1988-1994. *Am J Clin Nutr.* Jul 2002;76(1):187-92. [Medline]. [Full Text].

22. Holick MF. Vitamin D: importance in the prevention of cancers, type 1 diabetes, heart disease, and osteoporosis. *Am J Clin Nutr.* Mar 2004;79(3):362-71. [Medline]. [Full Text].

23. Chapuy MC, Arlot ME, Duboeuf F, et al. Vitamin D3 and calcium to prevent hip fractures in the elderly women. *N Engl J Med.* Dec 3 1992;327(23):1637-42. [Medline].

24. Trivedi DP, Doll R, Khaw KT. Effect of four monthly oral vitamin D3 (cholecalciferol) supplementation on fractures and mortality in men and women living in the community: randomised double blind controlled trial. *BMJ.* Mar 1 2003;326(7387):469. [Medline]. [Full Text].

25. Boonen S, Lips P, Bouillon R, et al. Need for additional calcium to reduce the risk of hip fracture with vitamin d supplementation: evidence from a comparative metaanalysis of randomized controlled trials. *J Clin Endocrinol Metab.* Apr 2007;92(4):1415-23. [Medline]. [Full Text].

26. [Best Evidence] Bischoff-Ferrari HA, Willett WC, Wong JB, et al. Prevention of nonvertebral fractures with oral vitamin D and dose dependency: a meta-analysis of randomized controlled trials. *Arch Intern Med.* Mar 23 2009;169(6):551-61. [Medline].

27. Heaney RP. Vitamin D depletion and effective calcium absorption. *J Bone Miner Res.* Jul 2003;18(7):1342; author reply 1343. [Medline].

28. Dawson-Hughes B, Harris SS, Krall EA, et al. Effect of calcium and vitamin D supplementation on bone density in men and women 65 years of age or older. *N Engl J Med.* Sep 4 1997;337(10):670-6. [Medline]. [Full Text].

29. Harwood RH, Sahota O, Gaynor K, et al. A randomised, controlled comparison of different calcium and vitamin D supplementation regimens in elderly women after hip fracture: The Nottingham Neck of Femur (NONOF) Study. *Age Ageing.* Jan 2004;33(1):45-51. [Medline]. [Full Text].

30. Bischoff-Ferrari HA, Dietrich T, Orav EJ, et al. Positive association between 25-hydroxy vitamin D levels and bone mineral density: a population-based study of younger and older adults. *Am J Med.* May 1 2004;116(9):634-9. [Medline].

31. Bischoff HA, Stahelin HB, Dick W, et al. Effects of vitamin D and calcium supplementation on falls: a randomized controlled trial. *J Bone Miner Res.* Feb 2003;18(2):343-51. [Medline].

32. Bischoff-Ferrari HA, Dawson-Hughes B, Staehelin HB, et al. Fall prevention with supplemental and active forms of vitamin D: a meta-analysis of randomised controlled trials. *BMJ.* Oct 1 2009;339:b3692. [Medline]. [Full Text].

33. Muir SW, Montero-Odasso M. Effect of vitamin d supplementation on muscle strength, gait and balance in older adults: a systematic review and meta-analysis. *J Am Geriatr Soc.* Dec 2011;59(12):2291-300. [Medline].

34. [Best Evidence] Lappe JM, Travers-Gustafson D, Davies KM, et al. Vitamin D and calcium supplementation reduces cancer risk: results of a randomized trial. *Am J Clin Nutr.* Jun 2007;85(6):1586-91. [Medline]. [Full Text].

35. Chen TC, Holick MF. Vitamin D and prostate cancer prevention and treatment. *Trends Endocrinol Metab.* Nov 2003;14(9):423-30. [Medline].

36. Garland CF, Comstock GW, Garland FC, et al. Serum 25-hydroxyvitamin D and colon cancer: eight-year prospective study. *Lancet.* Nov 18 1989;2(8673):1176-8. [Medline].

37. Garland CF, Garland FC, Gorham ED. Calcium and vitamin D. Their potential roles in colon and breast cancer prevention. *Ann N Y Acad Sci.* 1999;889:107-19. [Medline].

38. Garland FC, Garland CF, Gorham ED, et al. Geographic variation in breast cancer mortality in the United States: a hypothesis involving exposure to solar radiation. *Prev Med.* Nov 1990;19(6):614-22. [Medline].

39. Chen TC, Wang L, Whitlatch LW, et al. Prostatic 25-hydroxyvitamin D-1alpha-hydroxylase and its implication in prostate cancer. *J Cell Biochem.* Feb 1 2003;88(2):315-22. [Medline].

40. Freedman DM, Rajaraman P, Fuhrman B, et al. Sunlight, hormone replacement status and colorectal cancer risk in post-menopausal women. *Int J Cancer.* Sep 30 2009;[Medline]. [Full Text].

41. Tangpricha V, Flanagan JN, Whitlatch LW, et al. 25-hydroxyvitamin D-1alpha-hydroxylase in normal and malignant colon tissue. *Lancet.* May 26 2001;357(9269):1673-4. [Medline].

42. Mathieu C, Gysemans C, Giulietti A, et al. Vitamin D and diabetes. *Diabetologia.* Jul 2005;48(7):1247-57. [Medline].

43. Scragg R, Sowers M, Bell C. Serum 25-hydroxyvitamin D, ethnicity, and blood pressure in the Third National Health and Nutrition Examination Survey. *Am J Hypertens.* Jul 2007;20(7):713-9. [Medline].

44. Joergensen C, Hovind P, Schmedes A, Parving HH, Rossing P. Vitamin d levels, microvascular complications, and mortality in type 1 diabetes. *Diabetes Care.* May 2011;34(5):1081-5. [Medline].

45. [Best Evidence] Autier P, Gandini S. Vitamin D supplementation and total mortality: a meta-analysis of randomized controlled trials. *Arch Intern Med.* Sep 10 2007;167(16):1730-7. [Medline].

46. Correia LC, Sodré F, Garcia G, Sabino M, Brito M, Kalil F, et al. Relation of Severe Deficiency of Vitamin D to Cardiovascular Mortality During Acute Coronary Syndromes. *Am J Cardiol.* Nov 20 2012;[Medline].

47. Bjelakovic G, Gluud LL, Nikolova D, et al. Vitamin D supplementation for prevention of mortality in adults. *Cochrane Database Syst Rev.* Jul 6 2011;CD007470. [Medline].

48. Hollis BW, Wagner CL. Normal serum vitamin D levels. *N Engl J Med.* Feb 3 2005;352(5):515-6; author reply 515-6. [Medline].

49. Chapuy MC, Preziosi P, Maamer M, et al. Prevalence of vitamin D insufficiency in an adult normal population. *Osteoporos Int.* 1997;7(5):439-43. [Medline].

50. Holick MF, Binkley NC, Bischoff-Ferrari HA, et al. Evaluation, Treatment, and Prevention of Vitamin D Deficiency: an Endocrine Society Clinical Practice Guideline. *J Clin Endocrinol*

*Metab.* Jun 6 2011;[Medline].

51. Haddad JG, Matsuoka LY, Hollis BW, Hu YZ, Wortsman J. Human plasma transport of vitamin D after its endogenous synthesis. *J Clin Invest.* Jun 1993;91(6):2552-5. [Medline]. [Full Text].

52. Holick MF, Chen TC. Vitamin D deficiency: a worldwide problem with health consequences. *Am J Clin Nutr.* Apr 2008;87(4):1080S-6S. [Medline].

53. Bogh MK, Gullstrand J, Svensson A, Ljunggren B, Dorkhan M. Narrowband UVB three times a week more effective in treating vitamin D deficiency than 1600 IU oral vitamin D(3) /day: a randomized clinical trial. *Br J Dermatol.* May 25 2012;[Medline].

54. Lu Z, Chen TC, Zhang A, et al. An evaluation of the vitamin D3 content in fish: is the vitamin D content adequate to satisfy the dietary requirement for vitamin D?. *J Steroid Biochem Mol Biol.* Mar 2007;103(3-5):642-4. [Medline].

55. Holick MF, Shao Q, Liu WW, et al. The vitamin D content of fortified milk and infant formula. *N Engl J Med.* Apr 30 1992;326(18):1178-81. [Medline].

56. Tangpricha V, Koutkia P, Rieke SM, et al. Fortification of orange juice with vitamin D: a novel approach for enhancing vitamin D nutritional health. *Am J Clin Nutr.* Jun 2003;77(6):1478-83. [Medline]. [Full Text].

57. Hollis BW. Short-term and long-term consequences and concerns regarding valid assessment of vitamin D deficiency: comparison of recent food supplementation and clinical guidance reports. *Curr Opin Clin Nutr Metab Care.* Nov 2011;14(6):598-604. [Medline].

58. Bischoff H, Stahelin HB, Vogt P, et al. Immobility as a major cause of bone remodeling in residents of a long-stay geriatric ward. *Calcif Tissue Int.* Jun 1999;64(6):485-9. [Medline].

59. Elidrissy AT, Sedrani SH, Lawson DE. Vitamin D deficiency in mothers of rachitic infants. *Calcif Tissue Int.* May 1984;36(3):266-8. [Medline].

60. Heaney RP. Vitamin D, nutritional deficiency, and the medical paradigm. *J Clin Endocrinol Metab.* Nov 2003;88(11):5107-8. [Medline]. [Full Text].

61. Holick MF. Vitamin D deficiency. *N Engl J Med.* Jul 19 2007;357(3):266-81. [Medline].

62. Holick MF. Vitamin D: a millenium perspective. *J Cell Biochem.* Feb 1 2003;88(2):296-307. [Medline].

63. Malabanan A, Veronikis IE, Holick MF. Redefining vitamin D insufficiency. *Lancet.* Mar 14 1998;351(9105):805-6. [Medline].

64. Suda T, Ueno Y, Fujii K, et al. Vitamin D and bone. *J Cell Biochem.* Feb 1 2003;88(2):259-66. [Medline].

Medscape Reference © 2011 WebMD, LLC



PATIENTS & FAMILIES     EDUCATION & TRAINING     SUPPORT US     JUST FOR KIDS

SEARCH

Like 8  Send

# 2012

## Memo to Pediatricians: Screen All Kids for Vitamin D Deficiency, Test Those at High Risk

MEDIA CONTACT: Ekaterina Pesheva
EMAIL: epeshev1@jhmi.edu
PHONE: (410) 502-9433

**February 22, 2012**
As study after study shows the fundamental role vitamin D plays in disease and health, vitamin D deficiency — which often develops insidiously in childhood — should be on every parent's and pediatrician's radar, say physicians from the Johns Hopkins Children's Center.

"Vitamin D deficiency can be a problem year round, but because sun exposure is critical for vitamin D synthesis and production, the winter months further exacerbate what is a perennial problem," says Johns Hopkins Children's Center endocrinologist Dominique Long, M.D.

Levels at or below 20 nanograms per milliliter are considered suboptimal. Levels below 15 constitute deficiency and should be treated with supplements.

Hopkins experts say pediatricians should screen all children for risk factors and order blood tests for those found to be at high risk. Children at risk for vitamin D deficiency include:

- those with vitamin D-poor diets
- breast-fed infants because breast milk contains minimal vitamin D
- obese children
- those with darker skin because darker skin synthesizes less vitamin D from sun exposure than lighter skin
- those with certain medical conditions, including cystic fibrosis, type 1 and type 2 diabetes and certain gastrointestinal disorders, such as inflammatory bowel disease, which can interfere with food absorption

Several large-scale studies have found that vitamin D deficiency is widespread —one in 10 U.S. children are estimated to be deficient — and that 60 percent of children may have suboptimal levels of vitamin D.

Prolonged and untreated vitamin D deficiency can affect multiple organs and functions, including bone growth and density, metabolism, heart and immunity, but it rarely causes overt symptoms and often goes unnoticed.

Vitamin D deficiency in childhood can cause skeletal deformities, brittle bones, frequent fractures and lead to premature osteoporosis in later life. However emerging evidence suggests that vitamin D is involved in far more than bone health. Recent studies have found a link between low vitamin D levels and some cancers, heart disease, suppressed immunity and even premature death. These studies do not show that vitamin D deficiency can cause cancer or heart disease, experts caution, but do suggest that vitamin D may be a powerful player in the genesis of such disorders.

Much of our life-long health is pre-programmed in childhood, and many adult diseases are rooted in exposures, lifestyle and diet during the first decade of life, experts say, and vitamin D, or lack of it, is a classic example.

Long says that she sees at least one toddler with rickets-induced bowing of the legs in her clinic every month and at least one patient per year with seizures stemming from low calcium levels. Without sufficient vitamin D, only 15 percent of the dietary calcium is absorbed, and low calcium can, in rare cases, cause seizures and heart-rhythm anomalies, Long says. Other symptoms of low calcium include poor muscle tone, insufficient dental enamel and muscle spasms.

The good news is that once detected, vitamin D deficiency can be usually corrected easily with high-dose supplementation, Long says.

To prevent vitamin D deficiency, the American Academy of Pediatrics recommends that all breastfed infants receive supplemental 400 IU daily until they are weaned and start consuming vitamin D-fortified formula or other foods. The recommended daily dietary intake of vitamin D is 400 IU for children younger than 1 year, and 600 IU for those older than 1 year.

In addition, Long says, parents should ensure children get enough vitamin D in their diets. Foods rich on vitamin D include fish (sardines, salmon tuna), egg yolks, vitamin D-fortified milk, vitamin D-fortified orange juice, cereals, yogurt and cheese.

**Related Information:**

Low Vitamin D in Kids May Play a Role in Anemia
The Changing Face of Vitamin D
Children with Cystic Fibrosis Not Well Covered By Guidelines for Vitamin D Needs
Low Vitamin D Levels Pose Large Threat to Health
Pediatrics study
National Institutes of Health

*Founded in 1912 as the children's hospital at The Johns Hopkins Hospital, the Johns Hopkins Children's Center offers one of the most comprehensive pediatric medical programs in the country, with more than 92,000 patient visits and nearly 9,000 admissions each year. Hopkins Children's is consistently ranked among the top children's hospitals in the nation. Hopkins Children's Center is Maryland's largest children's hospital and the only state-designated Trauma Service and Burn Unit for pediatric patients. It has recognized Centers of Excellence in dozens of pediatric subspecialties, including allergy, cardiology, cystic fibrosis, gastroenterology, nephrology, neurology, neurosurgery, oncology, pulmonary, and transplant. Hopkins Children's Center is celebrating its 100th anniversary in 2012. For more information, please visit **www.hopkinschildrens.org***

## WebMD

Article Link: http://children.webmd.com/news/20121220/vitamin-d-overweight-kids

# Children's Health

## Low Vitamin D More Common in Overweight Kids

By Rita Rubin                    Reviewed by Laura J. Martin, MD
WebMD Health News



Dec. 24, 2012 – Overweight and obese children and teens are more likely to have low vitamin D levels than kids with healthy weights, a new study suggests.

The study is published in *Pediatrics*.

Vitamin D is essential for bone health. Bone growth is high during childhood and adolescence. So it may be especially important to identify and treat vitamin D deficiency during that time, the researchers write.

Vitamin D deficiency is also linked to a variety of chronic conditions, such as:

High blood pressure

Type 1 diabetes

Multiple sclerosis

Previous research suggests that obesity may put you at risk for vitamin D deficiency.

The Truth About Vitamin D

### Overweight Kids and Vitamin D

Researchers in the study analyzed data from more than 12,000 U.S. children and teens aged 6 to 18. The children were enrolled in the 2003-2006 National Health and Nutrition Examination Survey.

About 21% of the healthy-weight youngsters were deficient in vitamin D. That was also true for 29% of those who were overweight, 34% of those who were obese, and 49% of those who were severely obese.

Even after accounting for such factors as vitamin D supplementation and intake of milk, which is typically fortified with vitamin D, the rates of vitamin D deficiency were higher in Latinos and African-Americans. Among the severely obese youngsters, 27% of whites, 52% of Latinos, and 87% of African-Americans were deficient in vitamin D.

"The particularly high prevalence in severely obese and minority children suggests that targeted screening and treatment guidance is needed," the researchers conclude.

Researcher Christy Turer, MD, a pediatrician at the University of Texas Southwestern Medical Center and Children's Medical Center in Dallas, says she and her colleagues already were routinely checking vitamin D levels in children at specialty clinics, such as weight management clinics. Those found to be deficient are prescribed high-dose vitamin D supplements, a pill taken weekly. After eight weeks of treatment, their levels are rechecked, and if they're near normal, she'll cut them back to monthly doses of vitamin D supplements.

Turer also recommends that vitamin-D-deficient patients drink low-fat milk. If they don't like to drink plain milk, she says they can add artificially sweetened flavors that add only 15 calories a serving.

"The reason that milk is important is it has not just vitamin D, but it has calcium," she says. Unsweetened soy milk and almond milk are also good sources of vitamin D and calcium, Turer says.

### Go Outside and Play



Turer says overweight, vitamin-D-deficient children should walk away from the television or computer screen and go outside and move around. That's because the sun is one of the main sources of vitamin D.

It's not known whether children get as much vitamin D from the sun as adults, she says. Turer suggests that children should get 10 or 15 minutes of sun before putting on sunblock.

Parents who think their child might be deficient in vitamin D should talk to their doctor before giving them supplements that are available without a prescription, Turer says. "There are risks from taking too much vitamin D."

Checking the blood level of vitamin D costs about $100. Turer says more research is needed to determine whether routine screening is cost-effective and whether treating deficiencies reduces the risk of fractures and other related health problems.

**Earlier Research on Vitamin D**

Recent, smaller studies of children in Somerville, Mass., and Charleston, W.Va., reached similar conclusions.

Tufts researchers evaluated 145 fourth- through eighth-graders. More than 83% of the children were found to be vitamin D deficient. Researcher Lauren Au, RD, says that high levels of vitamin D deficiency may be partly explained by the fact that more than half of them were overweight or obese. Also, Au says, their Vitamin D levels were checked during the winter, when sun exposure is lower.

In another small study, Stephen Sondike, MD, an adolescent medicine specialist at West Virginia University, compared vitamin D levels in 76 patients aged 2 to 18. The patients had a diagnosis of obesity, chronic kidney disease, diabetes, high blood pressure, or cystic fibrosis. Only obesity was associated with vitamin D deficiency.

Sondike, medical director of the Disordered Eating Center of Charleston, says he routinely checks the vitamin D levels of overweight and obese patients. The notion that such children are malnourished might seem counterintuitive, he says, but "their diet is heavy in calories and not heavy in nutrients."

Top Picks
Predict Your Child's Future Height
How Much to Feed Kids Age 4-8
Fiber-Rich Lunch Ideas for Kids
Help Teach Your Kids How to Fall Asleep
How Do You Keep Your Family Active?
Helping Your Child Get Things Done

SOURCES:
Christy Turer, MD, University of Texas Southwestern Medical Center and Children's Medical Center, Dallas.
Lauren Au, RD, doctoral fellow in obesity, Tufts University.
Stephen Sondike, MD, medical director, Disordered Eating Center of Charleston; adolescent medicine specialist, West Virginia University.
Robinson, C. *Southern Medical* Journal, October 2012.
Au, L. *Public Health Nutrition*, Aug. 3, 2012.
Turer, C. *Pediatrics*, January 2013.
© 2012 WebMD, LLC. All rights reserved.

My Notes:



Find a *Healthier You* in the
**WebMD Video Library**



## 'Plethora' of diseases caused by low vitamin D

Vitamin D should be added to milk and bread to combat widespread deficiency that is linked to variety of illnesses, doctors say



Doctors have said the poor summer weather will contribute to an epidemic of vitamin D deficiency Photo: Alamy

By Rebecca Smith, Medical Editor

7:00AM GMT 14 Dec 2012

A lack of awareness about vitamin D deficiency and the 'plethora' of disease it is linked to is fuelling a rise in preventable illnesses among children, experts at the Royal College of Paediatrics and Child Health have said.

Despite low cost supplements being widely available health care professionals and parents do not know the importance of taking them, they said.

Doctors have said the poor summer weather will contribute to an epidemic of vitamin D deficiency as the lack of sunshine will have meant depleted stores of the vitamin which the body can make from sunlight.

The College has launched a campaign to ensure all pregnant women, those breastfeeding, children aged between six months and five years and the elderly aged over 65 take vitamin D supplements in accordance with guidelines.

It comes as figures show that cases of rickets, poor bone growth causing pain and bowed legs, have risen fourfold in the last 15 years.

In 1995/6 there were 183 recorded cases in England which rose to 762 in 2010/11. But experts believe many more cases are going undiagnosed and some are seeing cases on a weekly basis.

The College warned that only one in ten people get enough vitamin D from food and sunlight so supplementation is necessary.

An investigation into the effects of wider artificial fortification of foods should also be undertaken the College said.

Vitamin D can be found naturally in some margarines, eggs and in oily fish but it can be added to milk and cereals.

Vitamin D deficiency is known to increase the risk of diabetes, tuberculosis, multiple sclerosis and rickets and a quarter of children and around half of the white adults have a serious lack of the vitamin.

Professor Mitch Blair, Officer for Health Promotion at the RCPCH, said: "We know vitamin D deficiency is a growing problem – and localised research reveals startling high levels of vitamin deficiency amongst certain groups including children.

"People can only get a fraction of their recommended daily amount of vitamin D through food and very little from sunlight. So getting out in

the sun more or eating more oily fish isn't going to solve the problem.

"Lack of vitamin D is related to a plethora of serious illnesses in children and adults that could be prevented through relatively simple steps such as taking supplements."

The RCPCH is launching a campaign calling for: vitamin D supplements to be readily available at low-cost and high quality; an investigation into the pros and cons of further fortification of food with vitamin D; professional guidance for health care professionals on how to diagnose and treat diseases linked to vitamin D deficiency; and a public awareness campaign.

Professor Blair added: "The Government's 'Healthy Start' programme provides vitamins free to low income families and 'at risk' groups. But these vitamins appear to be in short supply and uptake is low.

"Ensuring people are aware that they're available is crucial – and there is some evidence to suggest we need to make these supplements more readily available for the wider population, which is already happening in some countries.

"And equally as important is making sure that all health care professionals can spot the signs of vitamin D deficiency in children; aches and pains, poor growth, muscle weakness and seizures – and make sure they get appropriately treated."

The RCPCH is producing a series of leaflets for paediatricians and other health care professionals highlighting the signs of vitamin D deficiency in patients to be published in spring 2013.

The Scientific Advisory Committee on Nutrition is currently looking into proposals for further vitamin D fortification of food and drink, as happens in countries including the United States, Canada and Finland.

© Copyright of Telegraph Media Group Limited 2013



# American Academy of Pediatrics

DEDICATED TO THE HEALTH OF ALL CHILDREN*

Professional Resources | Continuing Medical Education | Advocacy & Policy | AAP Store | About the AAP

Advanced Searc

AAP.org > About the AAP > AAP Press Room > Kids and Vitamin D Deficiency

---

**AAP Facts**

**Departments & Divisions**

**Committees, Councils & Sections**

**Chapters & Districts**

**AAP Press Room**

  Press Room Archive

  News Features

  Health & Safety Tips

  Public Service Announcements

  AAP in the News

  AAP Press Room Media Center

  AAP Conferences Press Information

  Media Kits

  Spokesperson Resources

  Leadership Bios

  Embargoed Media Content

**Donate Now**

**Corporate Relationships**

**Employment at AAP**

**Advertise with AAP**

**Help/Feedback**

---

a a a    print    email    share

# Kids and Vitamin D Deficiency

10/18/2012

For Release: October 17, 2012

Rosemont, IL, October 17, 2012 – A startling increase in the frequency of severe vitamin D deficiency is being reported in the U.S. and other countries. This severe deficiency can have a devastating impact on a child's bone strength, the United States Bone and Joint Initiative (USBJI) says. "Vitamin D is essential to our body's ability to absorb calcium from our diet to build strong bones which are the building blocks of a healthy body, and to make muscles move," says Dr. Ellen Raney of Shriners Hospitals for Children in Portland, Oregon. Several groups have joined USBJI to raise awareness of the importance of strong bones and muscles during World Pediatric Bone and Joint (PB&J) Day, celebrated on October 19, which is part of Bone and Joint Health National Awareness Week (Oct. 12-20).

Dr. Raney explains, "Vitamin D deficiency or nutritional rickets can show up in several ways. If the problem starts early, kids' growth may be severely stunted. The arms or legs may not grow straight, or bones may be weak and easily broken."

Jesus* is a 14-year-old boy with a dark complexion who began to complain of knee pain when he ran. Always a bit "knock-kneed," this became more pronounced, and he stopped playing basketball because of knee pain. His examination and X-rays showed severely abnormal bending at both knees. A blood test showed severe vitamin D deficiency.

Jack* is a 15-year-old boy with very pale skin who has always preferred video games to sports and doesn't get outside much. He was able to participate in physical education in school until recently, when he began having pain in both knees. His examination and x-rays showed he had fractures in both shin bones. His vitamin D level also was severely deficient.

Neither of these teenagers was born with this problem. Jesus' vitamin D deficiency prevented his bones from growing straight. Jack's severe vitamin deficiency led to his bones being too weak to support his weight.

During sunny times, the body can make sufficient vitamin D with just a few minutes a day of midday sun exposure without sun screen. However, dermatologists caution against direct sun exposure to avoid risks of skin damage and skin cancer. A useful alternative to sun exposure is supplemental vitamin D. There is some controversy about the amount of vitamin D that children and adults should take in, ranging from 400 IU to 2,000 IU daily. The American Academy of Pediatrics and the Institute of Medicine recommend a daily intake of 400 IU per day of vitamin D during the first year of life beginning in the first few days, and 600 IU for everyone over age 1. Everyone-- and in the case of children, their parents-- should consult their primary care professional to determine the correct amount of vitamin D they should be taking to ensure optimal vitamin D levels.

Both of these youngsters are doing well now thanks to a team approach including orthopaedic and pediatric specialists, and each has been placed on a vitamin D replacement program specific to his needs.

For more information about Vitamin D levels recommended for children, visit the website for the American Academy of Pediatrics, the Institute of Medicine, or Your Orthopaedic Connection.

This story is brought to you as part of World Pediatric Bone and Joint (PB&J) Day , celebrated on October 19, which is part of Bone and Joint Health National Awareness Week (Oct. 12-20).

###

---

## AAP MEDIA CONTACTS

**AAP Department of Communications**
Phone: 847-434-7877
Email: commun@aap.org

**AAP Department of Federal Affairs**
Phone: 202-347-8600
Email: kids1st@aap.org

### Related Information


**Vitamin D Supplementation for Infants**
The American Academy of Pediatrics (AAP) recommends Vitamin D supplementation for breastfed infants because they generally do not obtain adequate Vitamin D from other sources.


**Media Kits**
The American Academy of Pediatrics (AAP) assembles practice guidelines, key studies and other information to assist reporters who are researching stories.


**Media Kit: Nutrition**
The American Academy of Pediatrics (AAP) has assembled key reports, studies and other resources to assist reporters in their research on nutrition.


**AAP Recognizes the Importance of School Physicians**
Every school district should have a school physician and every school building a school nurse, according to a new policy statement from the American Academy of Pediatrics (AAP).


**Strength Based Approach**
Building on the asset model, the strength based approach gives a broad perspective on development more so than the traditional deficit approach.

The American Academy of Pediatrics is an organization of 60,000 primary care
pediatricians, pediatric medical subspecialists and pediatric surgical specialists dedicated
to the health, safety and well-being of infants, children, adolescents and young adults. For
more information, visit www.aap.org.

**Professional Resources**

Practice Support

Clinical Support

AAP Policy

Research

Journals & Publications

Webinars

Pediatric Careers

National Conference &
Exhibition (NCE)

**Continuing Medical Education**

PediaLink/Online Education

Maintenance of Certification

Continuing Medical Education
Publications

Education in Quality Improvement for
Pediatric Practice (EQIPP)

Life Support Programs

Live Activities

National Conference & Exhibition (NCE)

**Advocacy & Policy**

AAP Policy

Federal Advocacy

State Advocacy

Community Advocacy

AAP Health Initatives

**AAP Store**

Go to the AAP
Bookstore

Clinical
Publications

Life Support
Programs

Practice
Management

Patient Education
Resources

Parent Resources

Continuing Medical
Education (CME)

Pediatric Buyer's
Guide

**About the AAP**

AAP Facts

Departments &
Divisions

Committees,
Councils & Sections

Chapters & Districts

AAP Press Room

Donate Now

Corporate
Relationships

Employment at AAP

Advertise with AAP

Help/Feedback

Privacy Statement          Contact Us          Terms of Use          Support Center





## CNN.com.

🖨 PRINTTHIS

Powered by 🔁Limelight

# Vitamin D deficiency common in U.S. children

- Story Highlights
- Study: 70 percent of American kids aren't getting enough vitamin D
- Children with darker skin are more likely to be deficient in vitamin D
- Vitamin D helps control the protein renin, involved in blood pressure levels
- Vitamin D also helps the bones better absorb calcium

d/div>v!--startclickprintexclude-->
By Denise Mann

A whopping 70 percent of American kids aren't getting enough vitamin D, and such youngsters tend to have higher blood pressure and lower levels of good cholesterol than their peers, according to two new studies published this week in the journal Pediatrics. Low vitamin D levels also may increase a child's risk of developing heart disease later in life, experts say.

"We were astounded at how common it was," says study author Dr. Michal Melamed, an assistant professor of medicine, epidemiology, and population health at the Albert Einstein College of Medicine, in the Bronx, New York. "There is a lot of data that suggests adults with low vitamin-D levels are at risk for diabetes, high blood pressure, cardiovascular disease, and a lot of cancers, and if kids start out with low levels and never increase them, they may be putting themselves at risk for developing all of these diseases at a much earlier age."

Vitamin D is often called the "sunshine vitamin" because the human body makes it only when exposed to sunlight -- although it only takes 10 to 15 minutes a day to make an adequate amount. Vitamin D, which helps the bones better absorb calcium, is also added to multivitamins and milk.

In Melamed's study, the researchers looked at the vitamin D levels of more than 6,000 people ages 1 to 21. They checked for vitamin-D deficiency, which is defined as less than 15 nanograms per milliliter of blood (ng/mL), and vitamin-D insufficiency, which is defined as 15 to 29 ng/mL. Overall, 7.6 million, or 9 percent, of U.S. children were vitamin-D deficient, and another 50.8 million, or 61 percent, had insufficient levels of this important vitamin in their blood.

Children with low levels of vitamin D were more likely to have high blood pressure and lower levels of high-density lipoprotein, also known as good cholesterol -- two factors that are considered major risk factors for heart disease later in life. Health.com: How cholesterol affects your heart's health

Children with low vitamin-D levels also had higher levels of parathyroid hormone than their counterparts with adequate vitamin D in their blood. Parathyroid hormone is a measure of bone health. When levels are high, it suggests that bones need more calcium to grow. ▶Watch more on kids in the U.S. and low levels of vitamin D »

Overall, those most at risk for a vitamin-D deficiency were older, female, obese, drank milk less than once a week, and spent more than four hours a day watching TV, playing video games, or working on a computer. They were also more likely to be children with darker skin, including non-Hispanic blacks and Mexican-Americans. (Children with darker skin are more likely to be deficient in vitamin D because they have more melanin than their fairer counterparts. Melanin is the pigment that gives skin color, but it may prevent the skin from absorbing enough sunlight to produce an adequate amount of vitamin D.) Health.com: Battle aging with vitamin D

In the second study, a research team led by Jared P. Reis, Ph.D., of Johns Hopkins Medical Institutions, looked at 3,577 adolescents ages 12 to 19. Those with low levels of vitamin D were more likely to have high blood pressure, high levels of blood sugar, and metabolic syndrome (a cluster of factors known to increase risk of heart disease) than their counterparts with ample vitamin D in their blood, regardless of how much they weighed.

Exactly how a lack of vitamin D increases the risk of heart disease is an evolving story. In terms of blood pressure, vitamin D helps control renin, a protein that plays a role in regulating blood-pressure levels. Health.com: Why belly fat increases type 2 diabetes risk

The best vitamin-D boosting strategy involves a three-pronged approach, says Melamed. "You can get a little bit from food, but not as much as you need," she says. "Supplements are readily available, and kids like to take Flintstones or gummy-bear multivitamins, which typically contain vitamin D."

Also, parents should help their children get at least 10 to 15 minutes of sun exposure daily without sunscreen. "Set your watch and then apply sunscreen after 15 minutes," Melamed says. Some children, including those in high-risk groups, may need to be screened to check for low vitamin-D levels.

Dr. Michael F. Holick, Ph.D., a professor of medicine, physiology, and biophysics at Boston University School of Medicine, and the author of "The Vitamin D Solution" (to be released in April 2010), has been sounding an alarm about the dangers of low vitamin-D levels for years. Health.com: Easy food swaps cut cholesterol, not taste

"This is a recipe for serious diseases occurring in our children when they are in their 20s and 30s," he says. Holick was among the first to document the return of rickets--a disorder caused by a lack of vitamin D and other minerals--which can lead to the softening and weakening of the bones. Health.com: How to get vitamin D safely

"[But] rickets is just the tip of the iceberg," Holick says. "Vitamin-D deficiency has insidious, serious long-term health consequences for children that could remain with them throughout their lives," he explains. "[Parents should know] their child is likely to be vitamin-D deficient if the child does not take a supplement of 400 IU vitamin D a day and receive some unprotected sun. It is next to impossible to get enough vitamin D from diet, and the sun-phobic attitude has made the problem much worse."

ENTER *to win a monthly Room Makeover Giveaway from MyHomeldeas.com*

COPYRIGHT HEALTH MAGAZINE 2009

**All About**Cholesterol  •  High Blood Pressure

**Find this article at:**
http://www.cnn.com/2009/HEALTH/08/03/vitamin.d.children/index.html#cnnSTCText

☐ Check the box to include the list of links referenced in the article.

◆ 2008 Cable News Network

# Ehlers-Danlos Syndrome

PatientPlus articles are written by UK doctors and are based on research evidence, UK and European Guidelines. They are designed for health professionals to use, so you may find the language more technical than the condition leaflets.

Ehlers-Danlos syndrome (EDS) is a rare inherited condition with disruption of the integrity of structural proteins in skin, ligaments, cartilage and blood vessels, leading to fragility of connective tissues.

## Epidemiology

- Ehlers-Danlos syndrome (EDS) affects approximately 1 in 5,000 live births.[1]
- Inheritance is usually autosomal dominant.

## Presentation

Abnormalities of collagen production result in:

- Bruising, bleeding from the gastrointestinal tract.
- Dissecting aortic aneurysm at an early age.
- Wide scars.
- Laxity of joints.
- Herniae.
- Hyperelasticity of skin.

The first presentation may be premature rupture of the membranes.



## Types of Ehlers-Danlos syndrome

There are many types of Ehlers-Danlos syndrome (EDS) based on different gene mutations affecting the structure or assembly of different collagens. All share common features of fragile skin and laxity of joints and ligaments. The Villefranche classification of EDS substituted descriptions for earlier types numbered with Roman numerals:[2]

- Classic (formerly known as Type I and II):
  - Classical features of EDS (soft, doughy, hyperelastic skin) with atrophic scars.
  - Multiple bruises, especially on the legs.
  - Easy skin-splitting shows in childhood over the forehead, elbows, knees and chin.
  - Other features are epicanthic folds, blue sclerae, fibrous nodules over knees and ankles.

- Hypermobile type (formally known as Type III):
  - Most common and often not diagnosed.
  - Characterised by tall stature, blue sclerae and ready bruising.
  - Shows marked joint hypermobility but moderate skin elasticity and no scarring.

- Vascular type (formally known as Type IV):[3]
  - Appears as thin skin with venous patterns readily visible, ecchymoses over the knees and shins, premature ageing of the skin on the dorsum of the hands, feet and shins with a 'Madonna' face with large eyes, nasal thinning and small ear lobes.
  - The main problem is spontaneous rupture of medium/large arteries at any age from mid-adolescence to late adult life. Arterial aneurysms are also common.
  - Death results from arterial rupture but rupture of the sigmoid colon is also common.
  - Recent studies showed that 15% of women who became pregnant died due to complications during pregnancy.
  - Overall median lifespan is reduced to 48 years.

- Kyphoscoliosis type (formally known as Type VI):
  - Severe main features with early progressive fibrosis and severe motor delay.

- Arthrochalasia type (formally known as Types VII A and B):
  - Severe main features, short stature, hip dislocation, dentinogenesis imperfecta.

- Dermatosparaxis type (formally known as Type VII C):
  - Main features are variable, early tooth loss with severe periodontitis.

## Differential diagnosis

- Cutis laxa.
- Pseudoxanthoma elasticum.
- Other causes of joint hypermobility, eg benign joint hypermobility syndrome, Marfan's syndrome, osteogenesis imperfecta.[4]

## Investigations

- Diagnosis is normally made on the clinical presentation.
- Subcutaneous calcified spherules can be confirmed on X-rays.

## Management

- There is no specific treatment.
- Celiprolol, a beta1-adrenoceptor antagonist with a beta2-adrenoceptor agonist action, has been used to prevent arterial dissections and ruptures.[5]
- Trauma should be minimised, and protective clothing and padding may help.

Save time & improve your on Patient.co.uk


- Add notes to any clinical page and create a reflective




- Automatically track and log eve page you have viewed


- Print and export a summary to use i appraisal

- Genetic counselling should be provided.

## Complications

- Pregnancy may be very dangerous. Obstetric complications include risk of uterine rupture during labour, damage to the vagina and perineum, bleeding and rupture of blood vessels and the colon during the puerperium.[6]
- Abnormal bleeding may cause extreme difficulty with any surgical operation.

## Prognosis

- Lifespan is usually normal unless there is marked vascular fragility.
- A high prevalence of severe complications occurs in a minority of families.

Provide Feedback

## Further reading & references

- Ehlers-Danlos Syndrome, Type 1, Online Mendelian Inheritance in Man (OMIM); See OMIM for other types of Ehlers-Danlos
- Ceccolini E et al, Ehlers-Danlos Syndrome, Medscape, Sept 2011
- Gawthrop F, Mould R, Sperritt A, et al; Ehlers-Danlos syndrome. BMJ. 2007 Sep 1;335(7617):448-50.

1. Whitelaw SE; Ehlers-Danlos syndrome, classical type: case management. Dermatol Nurs. 2004 Oct;16(5):433-6, 449.
2. Beighton P, De Paepe A, Steinmann B, et al; Ehlers-Danlos syndromes: revised nosology, Villefranche, 1997. Ehlers-Danlos Am J Med Genet. 1998 Apr 28;77(1):31-7.
3. Watanabe A, Shimada T; Vascular type of Ehlers-Danlos syndrome. J Nippon Med Sch. 2008 Oct;75(5):254-61.
4. Malfait F, Hakim AJ, De Paepe A, et al; The genetic basis of the joint hypermobility syndromes. Rheumatology (Oxford). 2006 May;45(5):502-7. Epub 2006 Jan 17.
5. Ong KT, Perdu J, De Backer J, et al; Effect of celiprolol on prevention of cardiovascular events in vascular Lancet. 2010 Sep 6.
6. Erez Y, Ezra Y, Rojansky N; Ehlers-Danlos type IV in pregnancy. A case report and a literature review. Fetal Diagn Ther. 2008;23(1):7-9. Epub 2007 Oct 9.

**Disclaimer:** This article is for information only and should not be used for the diagnosis or treatment of medical conditions. EMIS has used all reasonable care in compiling the information but make no warranty as to its accuracy. Consult a doctor or other health care professional for diagnosis and treatment of medical conditions. For details see our conditions.

Original Author: Dr Colin Tidy                Current Version: Dr Hayley Willacy

Last Checked: 20/04/2011                Document ID: 866  Version: 23                © EMIS

Patient.co.uk is one of the most trusted medical resources in the UK, supplying evidence based information on a wide range of medical and health topics to patients and health professionals.

Search Patient.co.uk  Search Patient.co.uk      Search

## Connect with us

- Twitter
- Pinterest

- Youtube
- Google+
- Facebook

Like ⟨70k⟩

## For Patients

Health Information

Medicines

Clinical Trials

Wellbeing

MyHealth

Media

Directory

Patient Local

Patient Access

Discussion Forums

Sarah Says...

George Ford

## For Health Professionals

Patient Plus

UK Clinical Guidelines

Evidence Based Medicine

Textbooks and Journals

News

Higher Education

Healthcare pro blog

Medical Calculators

Shared decision aids

DVLA

Medline Information

## About Patient.co.uk

Accessibility

Awards

Careers

Contact / Feedback

Cookie policy

Disclaimer / Terms

Editorial Policy

FAQs

Mobile Access

Search widget

Site Map

About Us|Media Enquiries|Press Releases|Commercial opportunities|Advertise with us

     

Egton Medical Information Systems Limited. Registered in England. No 2117205
Registered Office: Rawdon House, Green Lane, Yeadon, Leeds LS19 7BY

 **Medical**

## Ricketts or Vitamin D deficeincy can there be a Genetic Link

Sent to Medical Experts September 8 2009 at 10:14 PM

Ricketts or Vitamin D deficeincy can there be a Genetic Link ?

Optional Information:
Gender: male
Age: 5mos

Already Tried:
Another sibling( currently 10y/o) has had this deficiency & he suffered broken bones @ the age of 2mos.Later he developed lesions to his eyes & that time this child was about 5 y/o so then was diagnosed with Vitamin A deficieny. Later as the child grew he also became Deficient in Vitamin E, & K. This 10y/o child currently sees an Endocrinologist for treatment. This 10 y/o has seen a GI doctor, whom says there is nothing wrong, so the only MD willing to treat the 10 y/o sibling for the Vitamin Deficiencies is the Endocrinologist. I am concerned because the 5month old is half brother to the 10 y/o & I had seen a few familiar sypmtoms that were also present on the 10y/o.
Sept99 (Online) -- 1 Accept / 1 Question

Status: **Awaiting Expert Reply**   Value: **$45**                                    1 Answer Accepted ✉

## Answer                                                           **ACCEPTED** ✓

September 8 2009 at 10:24 PM (10 minutes and 24 seconds later)

Thanks for your important and interesting question. I would say that as we know that in rickets there is weakening of bones and muscles due to lack of vitamin D and/or calcium. Yes there is linkage in a rare type of rickets. There is a type in rickets called familial hypophosphatemic rickets which is a rare disease to have and mostly transmitted as an X-linked dominant trait, and mutations on the phosphate regulating gene X-chromosome (PHEX) gene are responsible for the disease. Similarly, two hereditary defects related to vitamin D metabolism map to human chromosome 12q13-14. There is a need for more studies to be done and trials are going on.

Do ACCEPT the answer if you find it useful in this way I might get compensated for my work and time here. Bonuses and positive feedback will be appreciated.

Best of luck and keep in touch
Regards
Dr. Amir Javed

Edited by Dr. Amir on September 8 2009 at 10:42 PM

Dr. Amir (Offline)  -- Doctor -- 100% Positive Feedback on 1297 Medical
Accepts
MBBS, Master of Internal medicine & Gastroenterology with three years of
experience (london)

 CUSTOMER'S
CHOICE AWARD

## Your Reply

September 8 2009 at 10:58 PM (33 minutes and 33 seconds later)          Edit

where do we get testing?
Sept99 (Online) -- 1 Accept / 1 Question



**DISCLAIMER:** Information in questions, answers, and other posts on JustAnswer ("Posts") comes from individual users, not JustAnswer; JustAnswer is not responsible for Posts. Posts are for general information, are not intended to substitute for informed professional advice (medical, legal, veterinary, financial, etc.), and do not establish a professional-client relationship. The site and services are provided "as is" with no warranty or representations regarding the qualifications of Experts. JustAnswer is not intended or designed for EMERGENCY questions which should be directed immediately by telephone or in-person to qualified professionals. Please carefully read the Terms of Service.

 **Medical**

**Dr. Amir:** Profile | Feedback

### Dr. Amir's Profile



**Doctor**
100% Positive Feedback on 1297 Medical Accepts

**@ VERIFIED**

What's this?

| | |
|---|---|
| Account: | **Active** |
| Status: | **Offline** |

Search

| | |
|---|---|
| Member Since: | **February 17 2009** |
| Last Visit: | **September 8 2009** |
| Posts: | **3407** [16.78 posts per day] |

### Ask Dr. Amir Your Medical Question.

**Get Answer**

| | |
|---|---|
| **Location:** | London, United Kingdom |
| **Most Advanced Degree:** | Master's Degree |
| **School:** | Queen Mary University London |
| **Major or Emphasis:** | Medicine, surgery and master in Gastroenterol |

| | |
|---|---|
| **Professional Licenses:** | Pakistan medical and dental council |
| **Issuing License Agency:** | PMDC, British society of Gastroenterology |
| **Certifications, Awards, Patents, Publications & Other Education:** | MSc in Gastroenterology (London) MBBS (Bacheolar of medicine and surgery) First class Master degree in Gastroenterology from UK. Distinction in MBBS. Research experience in |

**Experience:** MBBS, Master of Internal medicine & Gastroenterology with three years of experience (london)

London for four
months.

**DISCLAIMER**: JustAnswer has not verified the accuracy or truthfulness of any of the
information provided in this Profile. To see what credentials have been verified by a
third-party service, please click on the "Verified" symbol above.

# IN THE COURT OF APPEALS FIFTH DISTRICT OF TEXAS AT DALLAS

## RIGOBERTO GUERRERO, JR.,

### APPELLANT

### V.

## THE STATE OF TEXAS, APPELLEE

### NO. 05-11-01298-CR



In The
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-11-01298-CR

## RIGOBERTO GUERRERO, JR., Appellant

## V.

## THE STATE OF TEXAS, Appellee

### On Appeal from the 15th Judicial District Court
### Grayson County, Texas
### Trial Court Cause No. 059446

# OPINION

Before Justices Moseley, Fillmore, and Myers
Opinion By Justice Fillmore

A jury convicted Rigoberto Guerrero, Jr. of injury to a child and assessed punishment of fifty years' imprisonment and a $10,000 fine. In one issue, Guerrero asserts the evidence is insufficient to support the conviction. We affirm the trial court's judgment.

## Background

In August 2009, Guerrero, his girlfriend, Lydia Spurgeon, and the couple's two children, two-year-old J.G. and five-month-old M.G., were living with Lydia's parents, James and Cheryl Spurgeon. During the week, Cheryl was the primary caregiver for J.G., while Guerrero was the primary caregiver for M.G. Guerrero did not like either Cheryl or James and kept M.G. in the bedroom for most of the day.

On Monday, August 24, 2009, M.G. was seen by Dr. Jill Breeze for a well-baby examination and received several vaccinations. Breeze described M.G. as "happy and healthy" during the visit. She noted no bruising or other injuries to M.G. According to Lydia, after receiving the vaccinations, M.G. was "fussy."

On Tuesday, August 25th, James got off work from his full time job with the City of Sherman at approximately 4:00 p.m. and immediately went to his evening job. Lydia's grandmother picked up Cheryl at approximately 8:30 p.m. Lydia dressed J.G. and M.G. in new pajamas for her grandmother's visit and did not notice anything wrong with M.G. when she changed him. According to Lydia, M.G. was moving his left arm on Tuesday evening.

Lydia was expecting her sister and brother-in-law, Lisa and Jeremy Bullock, for dinner on Tuesday. Lydia testified that Guerrero went to a friend's house because he did not want to see Lisa and Jeremy. Because Lydia was having difficulty preparing dinner while watching the two children, she requested Guerrero come home and assist her in getting M.G. to bed. Guerrero came home at approximately 9:45 p.m. and put M.G. to bed. Guerrero then returned to his friend's house. After James finished work at approximately 10:00 p.m., he picked Cheryl up and the two arrived home at approximately 10:20 p.m. James immediately went to bed. Guerrero returned at approximately 10:30 p.m. and ate dinner in the dining room. Lisa and Jeremy arrived at approximately 11:00 p.m., and J.G. was put to bed with James shortly after their arrival. Soon after Lisa and Jeremy arrived, Guerrero went into the bedroom that he and Lydia shared with M.G.

Some time later, Lisa, Lydia, Jeremy, and Cheryl heard a "real major," piercing cry from M.G. According to Lydia, it was a different cry from the fussiness that M.G. had exhibited since getting his vaccinations. Lydia went to check on M.G. and saw Guerrero holding him. Guerrero said he was calming M.G. down and had everything under control. Lydia returned to the living room.

Lisa and Jeremy left at approximately 12:15 a.m. without seeing M.G. Cheryl then went into the bedroom with James and J.G., and Lydia went into the bedroom with Guerrero and M.G.

On Wednesday, M.G. woke up around 6:30 a.m., and Lydia prepared a bottle for him. Guerrero indicated he would feed M.G. and Lydia could go back to sleep. Lydia found this unusual because Guerrero generally did not volunteer to care for M.G. that early in the morning. After being fed, M.G. went back to sleep. James woke up at approximately 6:45 a.m., but went back to sleep on the living room couch. Lydia and Guerrero left at 9:45 a.m. for a meeting at J.G.'s new preschool. Cheryl and J.G. got out of bed at approximately 10:15 a.m. M.G. woke up at about the same time, and James got him from his crib. M.G. was crying constantly. Although James changed M.G.'s diaper and attempted to feed M.G., he continued to cry. James thought M.G. was having a reaction to the vaccinations. He called Lydia and asked her to buy some Children's Tylenol and indicated he thought M.G. needed to see a doctor. Cheryl then changed M.G.'s clothes in preparation for the visit to the doctor's office. M.G. cried constantly while Cheryl changed his clothes.

When Guerrero and Lydia put M.G. into the car for the trip to Breeze's office, they noticed he was not using his left hand. Breeze ordered an x-ray of M.G.'s arm. The x-ray showed M.G. had a broken humerus in his left arm and two broken ribs. In Breeze's opinion, the broken humerus occurred within twelve hours of M.G. arriving at her office. According to Breeze, it takes a significant force to break the humerus. The break, along with the rib fractures, caused her to suspect abuse as the cause of the injuries. Breeze instructed Guerrero and Lydia to take M.G. to Children's Medial Center.

Dr. Suzanne Dakil testified that, in August 2009, she was a pediatrician working in the Referral and Evaluation of At Risk Children program at Children's and evaluated M.G. at the

hospital. According to Dakil, the break of M.G.'s humerus had occurred within a "day or two" because there was no healing shown on the x-ray. The x-ray also showed healing fractures of the right lateral second through sixth ribs and of the left lateral second through fourth and sixth and seventh ribs. These healing fractures were probably ten to fourteen days old. On September 9, 2009, additional x-rays were taken of M.G. These x-rays showed two additional healing fractures of the left eighth and ninth ribs. According to Dakil, these fractures were likely very new when M.G. was admitted into the hospital on August 26th and could not be seen until they had begun to heal. The two new fractures could have occurred at the same time as the broken arm. Dakil testified there were twelve total rib fractures that occurred at two different times.

Dakil testified a baby handles pain better than an adult. However, an infant will not tolerate the movement of a fracture. Dakil assumes the baby feels acute pain at the time the fracture occurs. However, if the baby is placed in a position where he is not moving, the baby will be fine until the fracture is moved again. If an adult is holding the baby or changing a diaper or clothes, the pain will be exquisite and the "child will let you know." However, if the adult lays the baby down, the baby will be fine.

Dakil testified a broken humerus is a very rare injury and, in children under nine months of age, is almost always caused by abuse. Either a direct perpendicular blow to the arm or a direct bending of the arm is necessary to cause a transverse fracture of this long bone. Generally, the rib fractures are caused by compression, such as squeezing the ribs or pushing the ribs against a hard surface. The ribs are not easy to break and a "good force" is necessary to cause the fractures. Dakil would not expect to see a broken humerus or broken ribs from a baby being dropped onto the floor. In Dakil's opinion, M.G.'s injuries were not accidental. Further, a two-year-old child could not have inflicted the injuries. Lydia, James, Cheryl, Lisa, and Jeremy all denied hurting M.G.

-4-

## Analysis

In one issue, Guerrero asserts the evidence is insufficient to establish when M.G. was hurt or that Guerrero caused the injuries. Guerrero specifically relies on evidence M.G. had been "fussy" for several days and that many people had access to M.G. on a regular basis, including Cheryl and James. Guerrero points out that Cheryl and James were caring for the child on Wednesday morning when the injury was discovered and "it is just as plausible that their access caused this injury."

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 1763 (2012). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 860. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames*, 353 S.W.3d at 860. The jury, as the fact finder, is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). We defer to the jury's determinations of credibility, and may not substitute our judgment for that of the fact finder. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury"). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

—5—

There was no direct evidence of when and how M.G. was injured. However, M.G. was not injured when Breeze examined him on Monday, August 24th. When Lydia changed M.G.'s clothes on Tuesday evening, she did not notice anything wrong with M.G. Further, according to Lydia, M.G. was using his left arm on Tuesday evening before he was put to bed. Lydia, Lisa, Jeremy, and Cheryl all testified they heard M.G. give a sharp cry between 11:00 p.m. and 12:00 a.m. on Tuesday evening when Guerrero was alone with M.G. On Wednesday morning, M.G. began crying inconsolably when he woke up. Although James and Cheryl were caring for M.G. on Wednesday morning, neither was alone with him for a significant period of time. Further, both James and Cheryl denied they hurt M.G. on Wednesday morning. When Breeze saw M.G. on Wednesday afternoon, she determined he had a broken left arm. In Breeze's opinion, the break occurred within twelve hours of her examination of M.G. Dakil testified the break of M.G.'s arm occurred within a day or two of her examination of M.G. Further, M.G.'s ribs had been broken on two occasions. According to Dakil, a significant amount of force was necessary to cause both the broken humerus and the broken ribs.

The jury heard all the testimony. It was the role of the jury "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames*, 353 S.W.3d at 860. Reviewing all the evidence in the light most favorable to the jury's verdict, we conclude a rational jury could have found beyond a reasonable doubt that M.G. was injured on Tuesday night and that Guerrero caused the injuries. *See Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 860. We resolve Guerrero's sole issue against him.

–6–